ORDERED PUBLISHED

FILED

FEB 23 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP Nos.   AZ-11-1094-KiWiJu |
| | ) | AZ-11-1113-KiWiJu |
| LOOP 76, LLC, | ) | (Cross-Appeals) |
| | ) | |
| Debtor. | ) | Bk. No.   09-16799-RJH |
| _____ | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| LOOP 76, LLC; GENESEE FUNDING, | ) | |
| LLC, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on January 19, 2012,
at Phoenix, Arizona

Filed - February 23, 2012

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Randolph J. Haines, Bankruptcy Judge, Presiding

Appearances:   Susan G. Boswell of Quarles & Brady, LLP argued for appellant, Wells Fargo Bank, N.A.; Gerald M. Gordon of Gordon Silver argued for appellee, Loop 76, LLC.

Before:  KIRSCHER, WILLIAMS,[1] and JURY, Bankruptcy Judges.

---

[1] Hon. Patricia C. Williams, Bankruptcy Judge for the Eastern District of Washington, sitting by designation.

KIRSCHER, Bankruptcy Judge:

We are asked to determine whether a third-party source for recovery on a creditor's unsecured claim, such as a guarantor, is a factor the bankruptcy court may consider when determining whether claims are substantially similar under 11 U.S.C. § 1122(a).[2] We conclude that it is, and we AFFIRM.[3]

## I. FACTUAL AND PROCEDURAL HISTORY

Loop 76 is an Arizona limited liability company that was formed in 2004 for the purpose of constructing, developing, and operating an office/retail complex located in the Airpark Design Center portion of Scottsdale, Arizona (the "Airpark Property"). Its owners are John Wright ("Wright"), who is an Arizona licensed real estate agent, and Crown City Properties, LLC ("Crown City"), an Arizona limited liability company. Wright and Crown City each hold a 50% interest in Loop 76, and Wright is the managing member. The principal member of Crown City is Michael Herlihy ("Herlihy"). Herlihy is a licensed broker in California. Wright and Herlihy have over 25 years experience as landlords, developers, and real estate brokers.

In 2005, Loop 76 obtained a $23,125,000 construction loan from Wells Fargo Bank, N.A. ("Wells Fargo") secured by the Airpark Property (the "Wells Fargo Loan"). Between March 2007

---

[2] Unless specified otherwise, all chapter, code, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[3] At oral argument, Appellee, debtor Loop 76, LLC ("Loop 76"), withdrew its cross appeal of the interest rate applied to Wells Fargo's secured claim.

and February 2008, Loop 76 sought permanent financing from Wells Fargo, among others, before the Wells Fargo Loan matured on December 31, 2008. Due to the tightened credit markets and the downturn in Phoenix's real estate market, Loop 76 was unable to secure replacement financing, and it defaulted on the Wells Fargo Loan. In July 2009, Wells Fargo filed suit against Loop 76 in state court seeking appointment of a receiver.

Loop 76, a single asset real estate case, filed a chapter 11 petition for relief on July 20, 2009. In September 2009, Wells Fargo filed suit in state court against the guarantors of the Wells Fargo Loan, including Wright, Herlihy, their respective spouses, and Phyllis Krause, Crown City's other principal. That suit remains pending.

After filing two plans and disclosure statements, to which Wells Fargo filed objections, on April 9, 2010, Loop 76 filed its First Amended Plan of Reorganization dated March 5, 2010, as modified March 22, 2010, and the accompanying Disclosure Statement (the "Plan"). For voting purposes, the Airpark Property's stipulated value was $17,050,000.

Class 3 consisted of an impaired secured claim by Genesee Funding, LLC ("Genesee") for $7,865.00 (the "Genesee Claim"). It was secured by a piece of window washing equipment called a Tractel Griphoist ("Griphoist"). Loop 76 proposed 24 equal payments on the Genesee Claim at 3.25% interest, with the remainder paid in full.

Class 2 consisted of the impaired secured claim of Wells Fargo. Because Wells Fargo was an undersecured creditor, Loop 76 proposed two alternative treatments of its allowed claim

3

(approximately $23 million) in the Plan. Under either alternative, the Plan provided monthly payments to Wells Fargo at the contract rate of 3.25% (or such other rate the court deemed appropriate) for a period of ten years on the secured portion of its claim. If Wells Fargo made an § 1111(b) election, it would receive these same monthly payments, plus 3.25% interest, until its $23 million claim was paid in full. If Wells Fargo did not make the § 1111(b) election, the unsecured deficiency portion of its claim would be placed in its own class - Class 8(B) - and receive a distribution of 10%.[4] All remaining unsecured creditors' claims (approximately $181,000) were put into Class 8 (or Class 8(A) if Wells Fargo did not make the § 1111(b) election) and would also receive a 10% distribution. In addition to using encumbered and unencumbered cash on hand to fund the Plan, Loop 76's equity holders agreed to contribute new value in an amount of up to $1 million, with $500,000 in the form of a cash deposit, and committed to provide up to another $500,000, if needed.

The bankruptcy court approved the Disclosure Statement on April 12, 2010. Shortly thereafter, Wells Fargo purchased three

---

[4] Wells Fargo's claim against Loop 76 exceeded the value of the Airpark Property, thus implicating § 506(a) and § 1111(b). Section 506(a) provides that a claim secured by a lien on property is considered secured up the value of such property and unsecured for the remainder. In short, Wells Fargo's claims have been bifurcated into two claims - one secured and one unsecured. Under § 1111(b), the creditor class may elect to have the claim allowed as a secured claim for the full contractual amount (including what would be the unsecured portion) rather than the amount of the collateral's value. This is known as the "§ 1111(b) election." Wells Fargo's claim is treated as a recourse claim.

4

claims from various unsecured trade creditors. It filed notices of transfer for each claim.

Wells Fargo declined the § 1111(b) election. As a result, its claim was bifurcated into a secured claim in Class 2 and an unsecured deficiency claim (about $6 million) in Class 8(B). It voted to reject the Plan for each of its claims. Impaired Classes 3 (Genesee) and 8(A) (other unsecured trade claims) voted to accept the Plan, with 100% of the claims and dollar amounts of Class 3 voting to accept the Plan, and 60% of the claims and 84% of the dollar amounts of Class 8(A) voting to accept the Plan.[5]

**A.    The Genesee Claim objection.**

On May 14, 2010, Wells Fargo filed an objection to the Genesee Claim, contending that it consisted of a bogus transaction with a bogus company, and that it had been contrived to create an accepting impaired class. Specifically, Wells Fargo argued that although Loop 76 produced a UCC-1 Financing Statement filed with the Arizona Secretary of State on July 21, 2009, which was one day after the petition date, Loop 76 failed to ever produce a security agreement. Therefore, without any terms of the arrangement provided in the Disclosure Statement or otherwise, no one could determine whether the Genesee Claim was even impaired as Loop 76 asserted. Wells Fargo further contended that Genesee was a bogus Colorado company that was not in good

---

[5] Class 4 consisted of an impaired claim filed by Maricopa County for unpaid real estate taxes in the amount of $536,863.68. Wells Fargo subsequently purchased the tax claim, thereby increasing the amount of its secured claim and eliminating Class 4 and its vote. Classes 5 and 6 were treated as unimpaired administrative expenses and deemed to have accepted the Plan. No claims existed in Class 7.

5

standing, and Greg Harrington ("Harrington"), its principal, was an elusive character whom Wells Fargo was unable to locate and whom the Arizona bankruptcy court, in an unrelated case, had determined was involved in a number of bankruptcy misdeeds and frauds, including a Ponzi scheme.

Loop 76 contended that no basis existed to disallow the valid Genesee Claim, and that Wells's Fargo's objection was merely an attempt to prevent confirmation of the Plan. Attached to Loop 76's response were declarations from Herlihy, Wright, and Harrington, and a Loan Agreement. According to Loop 76, Herlihy had approached Wright in early 2009 about purchasing a window washing system for the Airpark Property. The men decided that Loop 76 would borrow the funds for the equipment rather than pay cash for it. Wright learned that Harrington could procure the equipment and financing for it. Wright referred Harrington to Herlihy to discuss the purchase and financing of the equipment. Herlihy agreed to purchase the equipment and finance it through one of Harrington's companies. On May 1, 2009, Genesee sent a letter offer to Loop 76. Loop 76 accepted the offer and the parties entered into the Loan Agreement on May 4, 2009.

The Loan Agreement, governed by Arizona law, provided for a maximum loan of $100,000. The loan proceeds were to be used for "general equipment purchases for maintenance" for the Airpark Property and would be secured by any equipment Loop 76 purchased. The loan's interest rate was to be between 13.5% to 15%. The loan's term was 36 months, with interest-only payments for the first six months. A condition precedent to any loan was "[c]ompletion of the documentation and final terms of the

6

proposed financing satisfactory to Lender and Lender's counsel."

The only piece of equipment available at the time was the Griphoist, which was in inventory at Harrington's other company, Aries, so Harrington directed Aries to ship it to Loop 76. Loop 76 received the Griphoist sometime after July 4, 2009, but before the petition date on July 20, 2009. Genesee filed a UCC-1 Financing Statement describing the Griphoist on July 21, 2009. Loop 76 never made any loan payments to Genesee. After the petition date, Loop 76 was no longer able to purchase the remaining parts to the window washing system.

In its reply, Wells Fargo argued that no bill of sale or invoice existed for the Griphoist and no evidence proved that Aries received consideration for it or that Loop 76 ever took possession of it. Wells Fargo further argued that Wright and Herlihy's deposition testimony reflected that neither of them discussed the equipment's financing terms with Harrington. Finally, Wells Fargo contended that the Loan Agreement failed to serve as a security agreement because it lacked the requisite specificity.

**B.** **Wells Fargo's motion to determine classification of its unsecured claim.**

On May 18, 2010, Wells Fargo moved to classify its unsecured claim, requesting that its Class 8(B) claim be placed in the same class as other unsecured claims in Class 8(A) ("Motion to Classify Claim"). Wells Fargo contended that Loop 76's separate classification of its deficiency claim was impermissible "gerrymandering" of an accepting impaired class, which was evidenced by Loop 76's failure to provide any business or

7

economic justification for why the claim, which was substantially similar to other general unsecured claims, could be classified separately.

Loop 76 countered that it had no need to "gerrymander" by placing Wells Fargo's deficiency claim in Class 8(B); it fully expected (at least initially) that at least three impaired classes would vote to accept the Plan. Moreover, Loop 76 contended that Wells Fargo's deficiency claim was not substantially similar to the unsecured trade claims, and therefore required separate classification, because:(1) Wells Fargo was partially secured; (2) Wells Fargo was embroiled in litigation with the guarantors, who were a third-party source of payment on the debt; and (3) if Wells Fargo was successful in that litigation, it might be paid in full before other creditors. In other words, argued Loop 76, the legal character of the claims mandated separate classification.

**C.  Wells Fargo's objections to the Plan**.

Wells Fargo filed its objection to confirmation of the Plan on May 17, 2010. Although it raised numerous objections, only two are pertinent to its appeal. First, Wells Fargo objected to the Plan's proposed interest rate of 3.25% on its secured claim and contended that 11.9% was a more appropriate rate. However, at that rate, Wells Fargo argued that the Plan was not feasible because Loop 76 could never generate sufficient cash flow to service the debt. Second, as Wells Fargo asserted in its Motion to Classify Claim, the Plan violated § 1122(a) because its unsecured claim was placed in a class separate from the other unsecured claims solely to gerrymander an affirmative vote on the

8

Plan.

**D. The bankruptcy court's decision on the Genesee Claim objection and Motion to Classify Claim.**

The bankruptcy court held a hearing on the Genesee Claim objection and the Motion to Classify Claim on July 7 and 8, 2010. Witnesses Harrington, Wright, and Herlihy testified on July 7. Closing arguments were presented on July 8.

Based on the portions of the provided July 7 transcript, as to the Genesee Claim, Harrington testified that the Loan Agreement did not set forth specific repayment terms for the Griphoist because such terms would not have been reached until Genesee had sourced all of the window washing equipment encompassed in the commitment. Harrington explained that a Griphoist lifts a person up to the second floor and is a necessary component to a "maintenance" or window washing package. In Harrington's opinion, the Griphoist was only stage one of the system ordered by Loop 76; the high pressure washing equipment was stage two, which Genesee never shipped due to the bankruptcy filing.

Wright testified that Loop 76 continued to pay a service company to wash the Airpark Property's windows because it intended to acquire several pieces of equipment, like a lift and a power washer, but all Loop 76 had time to acquire before the bankruptcy was the Griphoist, which is only a lift and cannot wash windows. Wright further testified that the Griphoist was not really what Loop 76 wanted, but that it was something one of Harrington's entities had in stock. Wright confirmed that Loop 76 has possession of the Griphoist and that it has never paid for

9

it.  Wright admitted that no invoice for the Griphoist existed and that he did not possess a copy of the Loan Agreement, even though he is Loop 76's managing member and maintains all of its books and records.

Herlihy testified that he directed Harrington by phone to obtain a window washing system for Loop 76.  Herlihy confirmed that no purchase order for the Griphoist was ever drafted and that he and Harrington never discussed the Griphoist's price. Herlihy also confirmed that the Griphoist is not what Loop 76 wanted, although he has never seen it since he lives in California.  Herlihy testified that he did not discuss specific financing terms for the equipment with Harrington, but that he believed Wright had discussed the terms with Harrington.

Wells Fargo had no evidence to present on the claim classification issue.  After Loop 76 rested on the matter, the court expressed its opinion that the threshold question was whether the claims were substantially similar and, only if that answer was yes, would it reach the second question of whether justification existed for separate classification.

At the end of closing argument on July 8, 2010, the bankruptcy court ordered the parties to file further briefing on both issues.  In Wells Fargo's supplemental brief regarding the Genesee Claim objection, it contended that no enforceable contract for the Griphoist existed under Arizona law because the Loan Agreement lacked essential terms, including a specific interest rate, repayment terms, and any remedies for default. Further, argued Wells Fargo, Wright and Herlihy's testimony established that they had never discussed terms for the Griphoist

10

with Harrington, so therefore no meeting of the minds existed sufficient to form a contract. Thus, if the Loan Agreement failed as a contract, it could not suffice as a security agreement, which is an essential element for attachment of a security interest, and therefore the Genesee Claim failed. Wells Fargo alternatively argued that the bankruptcy court should designate Genesee's vote accepting the Plan under § 1126(e) because the totality of the circumstances surrounding it "screamed" bad faith.

Loop 76 contended in its supplemental brief that the Loan Agreement's terms were sufficiently specific, but even if one or more of the terms were left open, the contract did not fail for indefiniteness under Arizona law. Loop 76 further asserted that Genesee waived any conditions precedent to its making the loan by performing under the Loan Agreement and delivering the Griphoist.

In its supplemental brief in support of its Motion to Classify Claim, Wells Fargo contended that the inquiry in determining whether claims are substantially similar is to evaluate the "nature" of the claim as it relates to assets of the debtor, not on factors extrinsic to the bankruptcy case. Thus, argued Wells Fargo, the existence of a third-party source of payment could not be a basis for determining that a deficiency claim is not substantially similar to other unsecured claims because the guaranty does not change the nature or priority of the unsecured claim against the debtor.

Loop 76 argued that, contrary to Wells Fargo's assertion, the Ninth Circuit provides for a more flexible standard to determine if claims are substantially similar. According to Loop

11

76, courts in this circuit are allowed to look beyond the legal nature or rank of the claim as to the debtor and consider various factors, such as whether the claim is secured by collateral of a third party or whether the claim can be offset by the debtor's claims against the creditor. Therefore, contended Loop 76, because Wells Fargo could look to the guarantors for payment on its deficiency claim, its claim was not substantially similar to other unsecured claims and § 1122(a) mandated its separate classification.

The bankruptcy court entered its memorandum decision denying the Genesee Claim objection on September 23, 2010. Based on the evidence, it found that Loop 76 owed a debt to Genesee for the Griphoist. The court specifically found that the Loan Agreement constituted a security agreement because it evidenced the parties' intent that Genesee have a security interest in all equipment subsequently delivered to Loop 76.[6] While the court acknowledged that the business dealings between the parties were "sloppy at best," that some of the basic terms for repayment were missing, that Genesee's response to Wells Fargo's discovery had been less than candid, and that Harrington had been found guilty of fraud in another bankruptcy case, none of these facts were sufficient to conclude that the debt did not exist or that it was not secured.

On November 22, 2010, the bankruptcy court filed an opinion

[6] Although not disputed on appeal, the bankruptcy court also found that Genesee held a security interest in the Griphoist because the UCC-1 filing on July 21 was within the grace period allowed under Arizona law for purchase money security interests, and it was not stayed by §§ 362(b)(3) and 546(b)(1)(A).

12

denying the Motion to Classify Claim. In re Loop 76, LLC, 442 B.R. 713 (Bankr. D. Ariz. 2010). The court held that based on the language, structure and purpose of § 1122(a), the history of the former Bankruptcy Act, Ninth Circuit case law, particularly Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323, 327 (9th Cir. 1994), and the legislative intent of § 1129(a)(10), a claimant who has a third-party source of repayment for its claim is dissimilar from a claimant who lacks such alterative sources of payment. Therefore, if the preponderance of the evidence at the upcoming confirmation hearing supported that conclusion, then § 1122(a) mandated that Wells Fargo's deficiency claim be separately classified.[7] In re Loop 76, LLC, 442 B.R. at 714.

**E. Trial on the Plan.**

The bankruptcy court held a plan confirmation trial on December 7, 8 and 13, 2010. Based on what little of the transcripts from December 7 and 8 Wells Fargo provided, Phyllis Krause testified that she had a net worth over $3 million. Herlihy testified that his net worth was about $800,000. Wright

---

[7] At the end of its opinion, the bankruptcy court noted that the parties were free to introduce evidence at the confirmation hearing tending to show why the existence of the guaranty of Wells Fargo's deficiency claim either was or was not a significant factor affecting creditors' votes on the plan. In re Loop 76, LLC, 442 B.R. at 724. In other words, if Wells Fargo could show that it was no longer pursuing the guaranty, or that all of the guarantors were insolvent, then perhaps the existence of a guaranty was not an appropriate distinguishing characteristic to render the claims dissimilar.

Wells Fargo initially objected to allowing evidence of the guarantors' solvency, contending that any such evidence should have been submitted back in July 2010 at the initial hearing on the Motion to Classify Claim. Wells Fargo does not contest this evidentiary issue on appeal.

13

testified that he had $1 million in the form of cashier's checks to provide a capital contribution to the Plan, and that he had other assets available to satisfy the guaranty on the Loan, including a cashier's check for $300,000, $163,000 in cash from a tax refund, and $700,000 in proceeds from real property sales closing that month.

After hearing from all of the expert witnesses on December 8, the bankruptcy court orally announced its preliminary findings regarding the interest rate on Wells Fargo's secured claim and the Plan's feasibility. It opined that an appropriate interest rate would be 6.5%, but that this rate would render the Plan not feasible for the first three years. On the other hand, the court found that Loop 76 would be able to service the debt at a 6.5% interest rate in years four through ten. Therefore, the primary issue with feasibility was getting over the initial three-year period. However, the court found that the feasibility problem could be cured if: (1) Wright increased his commitment to $2 million; and (2) Wright secured his guaranty for that $2 million.

Prior to the third day of trial, Loop 76 filed an amendment to the Plan on December 10, 2010. In light of the bankruptcy court's findings on December 8, the equity holders now proposed to contribute $1 million cash in new value, and they committed to fund any shortfalls during the first three years of the Plan, up to another $1 million. The $1 million commitment was to be secured by collateral in a form acceptable to Wells Fargo or the bankruptcy court. The amendment also increased the interest rate on Wells Fargo's secured claim from 3.25% to 6.5%, or such other rate the bankruptcy court determined appropriate. On December

14

13, 2010, the parties discussed the proposed amendments to the Plan and provided closing arguments.

The bankruptcy court issued its memorandum decision confirming the Plan on December 21, 2010. It incorporated the court's preliminary findings from December 8 that Loop 76 would have sufficient cash flow to service the debt at a 6.5% interest rate in years four through ten of the Plan. As for feasibility of the Plan's first three years, the court found both expert witnesses to be credible, but concluded that neither of them provided a fair picture of the most likely performance of the Airpark Property; the truth was somewhere in between. In the bankruptcy court's opinion, the quality of the property's management, particularly when considering the horrendous market and in face of both a bankruptcy and a lawsuit on the guaranty, demonstrated both a management ability and a commitment to the success of the property, which constituted good evidence that Airpark Property would significantly outperform Wells Fargo's pessimistic projections, even if it would not perform as well as Loop 76 predicted. The bankruptcy court further noted that even Wells Fargo's expert acknowledged that Airpark Property is a high quality property, and that Loop 76 has been performing as well as can be expected. Feasibility was "substantially enhanced" by the solvent equity holders' commitment to fund up to $2 million (secured by collateral of equivalent value) to cover shortfalls in the Plan's first three years, and that the additional funding was almost sufficient to cover debt service even under Wells Fargo's experts' pessimistic analysis, which the court rejected. Based on these reasons, the bankruptcy court found that the Plan

15

was feasible and not likely to be followed by liquidation or further financial reorganization.

An order confirming the Plan was entered on February 23, 2011.[8]  Wells Fargo timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(L) and 1334.  To the extent the bankruptcy court's decisions regarding the Genesee Claim objection and the Motion to Classify Claim were interlocutory, they merged into the final, appealable order confirming the Plan.  See United States v. 475 Martin Lane, 545 F.3d 1134, 1141 (9th Cir. 2008) (under merger rule interlocutory orders entered prior to the judgment merge into the judgment and may be challenged on appeal).  Therefore, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1.   Did the bankruptcy court err in holding that a factor a court may consider in determining whether a creditor's claim is "substantially similar" to other unsecured claims is whether the creditor has a third-party source for payment of its unsecured claim?

2.   Did the bankruptcy court err in determining that a contract existed for the Genesee Claim and that the Genesee Claim was not contrived warranting designation under § 1126(e)?

---

[8] The confirmation order stated that it was incorporating all of the bankruptcy court's prior findings and conclusions set forth in prior minute entries, orders, opinions, and/or memorandum decisions, including its tentative rulings and conclusions stated on the record at the end of the confirmation hearing on December 8, 2010.

16

3.    Did the bankruptcy court clearly err in determining that the Plan was feasible?

## IV. STANDARDS OF REVIEW

We review findings of fact for clear error and issues of law de novo. Hoopai v. Countrywide Home Loans, Inc. (In re Hoopai), 369 B.R. 506, 509 (9th Cir. BAP 2007). The bankruptcy court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009).

When the facts are undisputed, whether a contract exists is a matter of law we review de novo. Kapp v. Nat'l Football League, 586 F.2d 644, 649 (9th Cir. 1978). Under de novo review, "we consider a matter anew, as if it had not been heard before, and as if no decision had been previously rendered." B-Real, LLC v. Chaussee (In re Chaussee), 399 B.R. 225, 229 (9th Cir. BAP 2008).

Whether claims are substantially similar is a question of fact reviewed for clear error. In re Johnston, 21 F.3d at 327.

The issue of whether a plan is feasible is one of fact, which we review under the clearly erroneous standard. Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517 (9th Cir. 2007) (citing Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.), 761 F.2d 1374, 1377 (9th Cir. 1985)).

///
///
///
///
///

17

# V. DISCUSSION

**A.  In re Johnston supports the bankruptcy court's holding that a third-party source for recovery on a creditor's unsecured claim is a factor the court can consider when determining whether claims are substantially similar under § 1122(a).**

## 1.  Section 1122(a) and governing law.

Classification of claims is governed by § 1122(a), which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  The Code does not expressly state whether a plan must classify similar claims together.  However, § 1122(a) mandates that dissimilar claims cannot be placed into the same class.  The bankruptcy court has broad discretion in classifying claims under § 1122(a).  As such, a bankruptcy court's finding that a claim is or is not substantially similar to other claims constitutes a question of fact reviewable under the clearly erroneous standard.  In re Johnston, 21 F.3d at 327.

The threshold question for the bankruptcy court when applying § 1122(a) is to determine whether the claims are "substantially similar."  The Code is silent on how to ascertain whether claims are "substantially similar."  The Ninth Circuit has determined that the bankruptcy judge "must evaluate the nature of each claim, i.e., the kind, species, or character of each category of claims."  In re Johnston, 21 F.3d at 327 (citing In re Los Angeles Land & Invs., Ltd., 282 F. Supp. 448, 453-54 (D. Haw. 1968), aff'd, 447 F.2d 1366, 1367 (9th Cir. 1971) (hereinafter "Los Angeles Land").  Because § 1122(a) mandates that dissimilar claims may not be placed into the same class, if

18

the bankruptcy court determines that the claims are not substantially similar, the inquiry ends there.

However, if the claims are substantially similar, the plan may place such claims in different classes if the debtor can show a business or economic justification for doing so. Barakat v. Life Ins. Co. of Va. (In re Barakat), 99 F.3d 1520, 1526 (9th Cir. 1996). Absent a business or economic justification, it is not enough to justify separate classification solely on the basis of the unsecured creditor's right to make an § 1111(b) election. Id. at 1526 (citing Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.), 166 B.R. 892 (9th Cir. BAP 1994) (separate classification of unsecured claims solely on their right to make an § 1111(b) election is impermissible and violates § 1122(a)). Furthermore, a court must not approve a plan placing similar claims differently solely to gerrymander an affirmative vote on the reorganization plan. Id. at 1525 (citing Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1992), cert. denied, 113 S. Ct. 72 (1992).

Notably, many courts have conflated the two-prong analysis required for classifying claims under § 1122(a), often glossing over the first prong of determining whether the claims are substantially similar, and proceeding to the second prong to determine whether gerrymandering has occurred or whether the plan proponent showed a business or economic justification for separately classifying similar claims. This explains, as the bankruptcy court phrased it, the "paucity of case law defining what constitutes either similarity or substantial similarity of

19

claims." In re Loop 76, LLC, 442 B.R. at 716. In re Johnston is the only Ninth Circuit case to squarely address this issue since the enactment of the Code in 1978.

### 2. Johnston and Barakat.

In In re Johnston, the issue before the Ninth Circuit was whether the bankruptcy court erred in determining that an unsecured creditor's claim was not substantially similar to the other unsecured claims. Just prior to filing his own chapter 11 bankruptcy, Johnston had filed a chapter 11 petition for one of his businesses, Capital Office Systems, Inc. ("COS"). Steelcase had filed a $2 million claim in COS's case secured by office furniture and related systems that it had manufactured and delivered to COS pursuant to a financing agreement personally guaranteed by Johnston. On the same day the COS bankruptcy was filed, Johnston and COS filed suit against Steelcase in state court. Steelcase's counterclaim asserted, inter alia, a claim against Johnston based on his personal guaranty.

Johnston's individual chapter 11 plan placed Steelcase's unsecured claim in its own class. The bankruptcy court confirmed Johnston's plan over Steelcase's objection that the plan improperly placed similar unsecured claims in separate classes. The bankruptcy court determined that because Steelcase was situated differently from all other unsecured claims, its claim was not substantially similar, and therefore separate classification was proper. The BAP affirmed.

The Ninth Circuit also affirmed, holding that Steelcase's separate classification did not violate § 1122(a) because "the legal character of its claim [was] not substantially similar to

20

the other claims." Id. at 328 (emphasis in original) (citing Los Angeles Land, 282 F. Supp. at 453-54, which held that separate classification of unsecured claims is justified "where the legal character of their claims is such as to accord them a status different from other unsecured creditors."). The In re Johnston court agreed with the bankruptcy court that the claims were not substantially similar because:

    (1)   Steelcase's claim, unlike the other unsecured claimants, was partially secured by collateral of COS, the primary obligor;

    (2)   Steelcase, unlike the other unsecured claimants, was embroiled in litigation with Johnston, and thus its claim may be offset or exceeded by Johnston's own claim against Steelcase; and

    (3)   Steelcase, if successful in the litigation, could be fully paid before other unsecured creditors.

Id. at 328.

In In re Barakat, a single asset real estate case, the bankruptcy court rejected debtor's plan, holding that it was impermissible, absent a business justification, to separately classify the creditor's deficiency claim from the general unsecured class. The bankruptcy court further found that debtor had failed to show a business justification. The legal issue before the Ninth Circuit was whether § 1122(a) sets any limitation on the separate classification of similar unsecured claims. In re Barakat held that, absent a legitimate business or economic justification, the debtor could not classify the creditor's unsecured deficiency claim separately from general unsecured claims. 99 F.3d at 1526. It rejected debtor's argument that under In re Johnston the claims were not substantially similar and required separate classification. The

21

court distinguished In re Johnston, concluding that Barakat's case lacked any of the "special circumstances" involved in In re Johnston, such as another source of recovery for the creditor's claim. Id. The court concluded that the claim at issue in In re Barakat was "simply a legally created recourse debt[,]" allowed by a creditor's right to make a § 1111(b) election. Id.

### 3. The bankruptcy court's ruling.

The bankruptcy court concluded that In re Johnston allows a court to consider whether the claimant has a nondebtor source for repayment of its claim in determining whether claims are or are not substantially similar. In re Loop 76, LLC, 442 B.R. at 717-18. In other words, In re Johnston holds that the bankruptcy court is not restricted to considering the legal character of the claim "as it relates to the assets of the debtor,"[9] but that it can consider in its analysis other interests held by the claimant. Id. at 718. Ultimately, the bankruptcy court concluded that the existence of a third-party source of payment - the guarantors - rendered Wells Fargo's deficiency claim dissimilar to the unsecured trade claims.

To support its position on In re Johnston, the bankruptcy court examined case law under the former Bankruptcy Act, Chapters X and XI, and concluded that the Code did not adopt Chapter X's classification rule, which utilized a more rigid standard of considering only the "nature" of the claim - i.e., its rank or priority. Rather, in the court's opinion, the Code adopted the

---

[9] Id. at 718 (citing Los Angeles Land, 282 F. Supp. at 453-54).

22

much more flexible standard of Chapter XI's classification scheme allowing the plan proponent to classify claims on some basis other than according to its "nature." Id. at 719-20. The bankruptcy court reasoned that because In re Johnston found determinative the fact of Steelcase's nondebtor source for payment of its claim, which has no bearing on the "nature" of the claim as so defined, In re Johnston necessarily rejected pre-Code case law, including the Chapter X case of Los Angeles Land, which considered only the "legal character or the quality of the claim as it relates to the assets of the debtor." Id. at 720.

**4.  Analysis.**

Wells Fargo raises several arguments on appeal. First, it contends that the bankruptcy court erred in holding that under In re Johnston the existence of a third-party source of payment renders a deficiency claim dissimilar to other unsecured claims. Specifically, Wells Fargo argues that the bankruptcy court erred in concluding that pre-Code case law was superseded by the Code, and that In re Johnston confirmed this notion. Wells Fargo contends that the Ninth Circuit requires classification to be based on the nature of the claim as it relates to the assets of the debtor. We disagree.

When Congress enacted the Code in 1978, it cobbled together parts of old Bankruptcy Act, Chapters X, XI, and XII, to form the new Code Chapter 11. Code § 1122 is derived from Act §§ 597 (Chapter X) and 751 (Chapter XI) (Repealed 1978). Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 585 (6th Cir. 1986). As the Sixth Circuit noted in U.S. Truck:

23

It is difficult to follow Congress' instruction to apply the old case law to the new Code provision. The old case law comes from two different sources. Chapter X of the old Act was designed for thorough financial reorganizations of large corporations. It imposed a very formal and rigid structure to protect the investing public. Chapter XI was designed for small nonpublic businesses, did not permit the adjustment of a secured debt or of equity, and thus contained few investor-protection measures. The idea behind Chapter 11 of the Code was to combine the speed and flexibility of Chapter XI with some of the protection and remedial tools of Chapter X. Thus, Congress has incorporated, for purposes of interpreting section 1122, the case law from two provisions with different language, that were adopted for different purposes, and that have been interpreted to mean different things.

Id. at 586 (citations omitted).

In reviewing both Chapters X and XI and the related jurisprudence, it is clear that they did not use the same classification requirements. Under Chapter X, the court classified claims and interests according to the "nature of their respective claims." 11 U.S.C. § 597 (Repealed 1978). According to the interpretive case law, substantial differences in the nature of claims dictated separate classification, although the courts were afforded some discretion. See Los Angeles Land, 282 F. Supp. at 453. Alternatively, Chapter XI expressly validated "provisions for treatment of unsecured debts on a parity with the other, or for the division of such debts into classes and the treatment thereof in different ways or upon different terms." 11 U.S.C. § 757(1) (Repealed 1978).

It is readily apparent that the case law dealing with Chapter X classifications differs widely from that under Chapter XI. Classification and treatment of claims under Chapter XI allowed the debtor broad latitude in developing its plan. The standard for classification required that the division of unsecured claims be reasonably necessary and proper so that the plan provided all creditors with at least as much compensation as they would receive in a liquidation

24

proceeding. Classification under Chapter X, in contrast, was considerably more restrictive. Although classification was dependent on individual factual circumstance and broad judicial discretion, claims ordinarily were classified according to their legal character and priority rank.

William Blair, Classification of Unsecured Claims in Chapter 11 Reorganization, 58 AM. BANKR. L.J. 197, 217 (1984) (noting that the lack of a single classification standard in Chapters X and XI renders somewhat uncertain the explanation in the legislative history that the § 1122 classification standard is found in prior case law). Although the Code draws on portions of both Chapters X and XI, it is silent as to which, if either, of the two prior approaches to classification of similar claims the Code adopted. As observed in U.S. Truck, legislative history sheds little, if any, light on the matter. 800 F.2d at 586.

We agree with the bankruptcy court, and the other authority noted above, that Chapter 11 bears greater resemblance to the Act's Chapter XI than it does to the Act's Chapter X with respect to claim classification. In re Loop 76, LLC, 442 B.R. at 720. As such, the Ninth Circuit's pre-Code holding in Los Angeles Land, that classification be based on the nature of the claim as it relates to the assets of the debtor, is not consistent with the more flexible approach to claim classification under the Code.

In re Johnston recognized the Code's flexibility on this issue. While In re Johnston cited Los Angeles Land for the proposition that bankruptcy judges must evaluate the "nature" of each claim to determine similarity, Los Angeles Land's definition of nature of the claim as "an analysis of the legal character or

25

the quality of the claim as it relates to the assets of the debtor" was not incorporated into the In re Johnston holding. In re Johnston, 21 F.3d at 327. In re Johnston did adopt, however, Los Angeles Land's holding that the bankruptcy court has "broad latitude" in determining the similarity of claims, and that it need not follow some narrow definition. Id. When the In re Johnston court considered third-party sources of recovery for Steelcase's unsecured claim as a basis for dissimilarity, it was clearly looking beyond just Johnston's assets. Thus, while not expressly overruling Los Angeles Land, In re Johnston rejected its narrow definition of "nature" of the claim by holding that, at minimum, a bankruptcy court may consider sources outside of the debtor's assets, such as the potential for recovery from a nondebtor or nonestate source.

Accordingly, we reject Wells Fargo's argument that a third-party guarantor does not render its deficiency claim dissimilar from other unsecured claims. Its argument is based on case law inconsistent with In re Johnston's holding that whether the claim is substantially similar does not rest entirely on how it relates "to the assets of the debtor."[10]

---

[10] Wells Fargo relies heavily on In re AOV Indus., Inc., 792 F.2d 1140, 1151 (D.C. Cir. 1986) for the proposition that the focus of claim classification under § 1122(a) is the legal character of the claim "as it relates to the assets of the debtor." First, AOV does not reflect the law in the Ninth Circuit. Moreover, while AOV held that "[t]he existence of a third-party guarantor does not change the nature of a claim vis-a-vis the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are 'substantially similar' for classification purposes," this does not square with that circuit's prior decision in a 1982 case which considered this
(continued...)

26

We also reject Wells Fargo's argument that the bankruptcy court's holding is inconsistent with In re Johnston and In re Barakat because neither case expressly held that a third-party source of payment made the claim at issue dissimilar to the other unsecured claims. As for In re Johnston, the third-party source for recovery was collateral, not money. Presumably, the court's lack of any reference to a cash source was because it was not a fact in the case. Furthermore, the Ninth Circuit is not in the business of issuing advisory opinions on issues not raised before it. In In re Barakat, the court had no reason to address a third-party source of payment because none existed.

Wells Fargo further argues that the bankruptcy court's decision is inconsistent with In re Barakat's express holding that deficiency claims are so "substantially similar" to other

---

[10](...continued)
issue under both § 1122(a) and § 1322(b):

> We think the courts erred in holding that section 1122(a) prohibits classification based on the presence of a co-debtor. Section 1122(a) specifies that only claims which are "substantially similar" may be placed in the same class. It does not require that similar claims must be grouped together, but merely that any group created must be homogenous. Although some courts have held that section 1122(a) prohibits classification based on any criterion other than legal right to the debtor's assets, the plain language of the statute contradicts such a construction. Moreover, section 1122(a) so interpreted would conflict with section 1322(b)(1), which specifically authorizes designation of more than one class of unsecured creditor, each presumably with equal legal rights to the debtor's estate.

Barnes v. Whelan (In re Barnes), 689 F.2d 193, 201 (D.C. Cir. 1982) (citations omitted) (emphasis added).

27

unsecured claims they cannot be classified separately from other unsecured claims, absent a business or economic justification. The In re Barakat court, relying on In re Johnston, obviously looked for something to distinguish the deficiency claim from the other unsecured trade claims, but found that nothing rendered it dissimilar - it was "simply a legally created recourse debt." In re Barakat, 99 F.3d at 1526 (discussing In re Johnston and concluding that the none of the "special circumstances" rendering the claims dissimilar in In re Johnston were present). In re Barakat supports In re Johnston in that certain characteristics or "special circumstances" can distinguish unsecured claims, including deficiency claims, and render them dissimilar. The bankruptcy court here engaged in the same analysis as the Ninth Circuit did in In re Johnston and In re Barakat, but, unlike the court in In re Barakat, it found that Wells Fargo's deficiency claim did have distinguishing characteristics that rendered it dissimilar from the unsecured trade claims. Therefore, we see no inconsistency.

Here, we have an undersecured creditor who has a third-party source of recovery for its deficiency claim, the guarantors, whom it has already sued. Even if Loop 76 makes the 10% payment on the claim, Wells Fargo can still proceed to collect its entire debt from the guarantors. This is clearly a "special circumstance" that does not apply to any other unsecured claimants and accords Wells Fargo a different status. In re Barakat, 99 F.3d at 1526; In re Johnston, 21 F.3d at 328. Contrary to Wells Fargo's argument, we see no legal distinction between whether the claimant can recover against collateral held

28

by a third party, or whether the claimant can recover from a third-party guarantor, when determining the similarity of the claims.  See <u>Principal Mutual Life Ins. Co. v. Baldwin Park Towne Ctr., Ltd. (In re Baldwin Park Towne Ctr., Ltd.)</u>, 171 B.R. 374, 377 (Bankr. C.D. Cal. 1994) (citing <u>In re Johnston</u> and finding that an unsecured deficiency claim was not of the same "species" and dissimilar to the unsecured trade claims because, <u>inter alia</u>, the trade claimants could pursue the general partner for recovery).

We conclude that <u>In re Johnston</u> allows the bankruptcy court to consider the existence of a third-party source for payment, including a guarantor, when determining whether unsecured claims are substantially similar under § 1122(a).  Accordingly, we see no error by the bankruptcy court.[11]

---

[11] Based on our decision, we need not address the issue of whether Loop 76 provided a business or economic justification for separately classifying similar claims.  We also need not consider whether Loop 76 separately classified similar claims in order to gerrymander an affirmative vote for the Plan.

Furthermore, to the extent Wells Fargo argues that evidence of the guarantors' financial condition was inconclusive, which is a question of fact, collectability of the debt was never discussed in <u>In re Johnston</u>.  Thus, we question whether it is even a factor to consider.  In any event, we are unable to adequately review this issue because Wells Fargo failed to provide the entire transcript reflecting the guarantors' testimony from December 7, 2010.  See <u>Kritt v. Kritt (In re Kritt)</u>, 190 B.R. 382, 387 (9th Cir. BAP 1995) (when appealing a question of fact appellant must include the entire record relied upon by the trial court for review); 9th Cir. BAP Rule 8006-1 (excerpts of record shall include the transcripts necessary for adequate review in light of the standard of review to be applied to the issues before the Panel); FRAP 10(b)(2).

Accordingly, we affirm the bankruptcy court's finding in its December 21, 2010 Memorandum that the guarantors were solvent.
(continued...)

29

**B. The bankruptcy court did not err when it overruled Wells Fargo's objection to the Genesee Claim.**

The parties agree that Arizona law governs this issue. Although raised previously, Wells Fargo no longer contends that Genesee failed to perfect its security interest in the Griphoist. What Wells Fargo does contend on appeal is that the Loan Agreement lacks sufficient specification of terms under Arizona law to constitute a contract. Thus, if no contract exists, then Genesee's claim fails. Alternatively, Wells Fargo contends that because the evidence suggests the Genesee Claim was contrived and not procured in good faith under § 1126(e),[12] then Genesee's vote in favor of the Plan should not count. Wells Fargo complains that the bankruptcy court failed to make any findings on the "bad faith" issue.

**1. Applicable law.**

For an enforceable contract in Arizona, "an offer, an acceptance, consideration, and sufficient specification of terms so that obligations involved can be ascertained" must exist. K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n, 677 P.2d

---

[11](...continued)
Kyle v. Dye (In re Kyle), 317 B.R. 390, 393 (9th Cir. BAP 2004), aff'd, 170 F. App'x 457 (9th Cir. 2006) (failure to provide necessary transcripts may be grounds for summary affirmance of the appeal).

[12] Section 1126(e) provides:

On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

1317, 1320 (Ariz. Ct. App. 1983). The requirement of certainty is not so much a contractual validator as it is a factor relevant to determining the ultimate element of contract formation, i.e., whether the parties manifested assent or intent to be bound. Schade v. Diethrich, 760 P.2d 1050, 1058 (Ariz. 1988). "The requirement of reasonable certainty of terms arises from the inescapable fact that the uncertainty of the promises may indicate that a proposal or acceptance was not intended to be understood as a binding offer or acceptance." Id.

**2. Analysis.**

Wells Fargo contends that the Loan Agreement was merely an "agreement to agree" and does not constitute a contract because: (1) it does not contain any terms by which the court could determine breach or enforcement of a remedy; (2) it does not contain repayment start dates or amounts; (3) no agreement was reached on the interest rate; and (4) the parties never discussed the financing terms.

We agree the Loan Agreement does not contain any precise remedy provisions in case of breach, but it does contain an indemnity clause and a waiver to a jury trial in any suit, action, proceeding or counterclaim arising out of or related to the Loan Agreement. It also lacks a start date for repayment, but it does set forth a payment term of 36 months, with a balloon payment due at the end of month 36. It is also true that Herlihy, Wright, and Harrington never discussed in detail the financing terms. However, Wells Fargo cites to no authority for the proposition that an oral discussion regarding financing terms must precede the written agreement the offeree accepted.

31

Finally, the Loan Agreement does not contain a specific interest rate, but it does contain a range of rates from 13.5% to 15%. The lack of a specific rate is explained by the agreement's condition precedent that any loan would not be extended to Loop 76 until the financing terms were satisfactory to Genesee. However, Genesee waived that particular condition by performing under the Loan Agreement and delivering the Griphoist to Loop 76. See Calamari & Perillo, The Law of Contracts 273 (1st ed. 1970) ("After a failure of an express condition . . . the party for whose benefit the condition exists normally has the power to elect to cancel his performance or to proceed with performance. . . . . An election may be, and often is, manifested by conduct. Thus, an election to waive a condition exists if the promisor continues his own performance (if the performance was dependent upon the condition) or by acceptance and retention of a defective performance.").

In this case, the parties' action shows conclusively that they intended to form a binding agreement, and therefore the few missing terms left open or to be agreed upon is not fatal. Schade, 760 P.2d at 1058. Here, Wright referred Harrington to Herlihy to discuss Loop 76's purchase of a window washing system. Harrington told Herlihy that he could procure such equipment as well as provide the requisite financing. Herlihy agreed and directed Harrington to proceed. Genesee caused the Loan Agreement to be sent to Loop 76. Herlihy and Wright executed the Loan Agreement on the debtor's behalf, thereby accepting its terms, and sent it back to Genesee. Genesee then caused the Griphoist to be delivered to Loop 76, and Loop 76 received it.

32

"'The fact that one of [the parties], *with the knowledge and approval of the other*, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby.'"  Schade, 760 P.2d at 1059 (quoting 1 A. Corbin, CORBIN ON CONTRACTS § 95, at 407 (1963) (emphasis in Schade).  The fact that the Griphoist turned out not to be exactly what Loop 76 wanted does not make the contract any less valid.  Furthermore, considering the simplistic nature of the transaction, we are certain that a court in reviewing the terms of the Loan Agreement could determine what constitutes breach and fashion an appropriate remedy for the non-breaching party.  See ARIZ. REV. STAT. ANN. ("A.R.S.") § 47-2204(C) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.").[13]

---

[13] To the extent Wells Fargo contends that the Loan Agreement does not constitute a security agreement, we disagree. A.R.S. § 47-9102(A)(72) provides that a "security agreement" is "an agreement that creates or provides for a security interest." A.R.S. § 47-9203 requires that a security agreement describe the collateral.  A.R.S. § 47-9108 provides that collateral is sufficiently described in a security agreement if it identifies the collateral by, inter alia, specific listing, category, or quantity.  Evidence within the transactional documents between the parties can indicate whether they intended to create a security interest.  Bank of Am., N.A. v. Outboard Marine Corp. (In re Outboard Marine Corp.), 300 B.R. 308, 324 (Bankr. N.D. Ill. 2003).

Here, the transactional documents evidence Genesee's and Loop 76's intent to create a security agreement in the Griphoist. While the Loan Agreement does not specifically describe the Griphoist, it clearly shows that the intended use of the loan proceeds was to purchase general equipment for maintenance of the

(continued...)

33

As for Wells Fargo's alternative bad faith argument, the bankruptcy court acknowledged the parties' business dealings were "sloppy at best," that Genesee's response to Wells Fargo's discovery had been less than candid, and that Harrington had been involved in fraud in another bankruptcy case. However, it concluded that none of these facts were sufficient to conclude that the debt did not exist or that it was not secured. By these findings, the bankruptcy court essentially found that the Genesee Claim was not contrived, and therefore it did not need to address the issue of designating Genesee's vote under § 1126(e).

We review the bankruptcy court's finding on the issue of bad faith for clear error. Rosson v. Fitzgerald (In re Rosson), 545 F.3d 764, 774 (9th Cir. 2008). In considering that standard of review, and that we must afford the bankruptcy court great deference regarding the credibility of witnesses (Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010)), we conclude that the court's finding of lack of bad faith is not illogical, implausible, or without support in the record. Hinkson, 585 F.3d at 1261-62.

**C. The bankruptcy court did not err when it determined that the Plan was feasible.**

**1. Applicable law.**

To be confirmed, a plan of reorganization must be feasible.

[13](...continued) Airpark Property. The Griphoist, which is specifically described in the UCC-1 Financing Statement, is a "category" of equipment that can be used for building maintenance, and therefore complies with A.R.S. § 47-9108. Whether taken alone, or with the UCC-1 Financing Statement, the evidence established the existence of a security agreement between the parties.

34

Section 1129(a)(11) provides, in relevant part, that a plan is not feasible if the plan is "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." In this circuit, all a debtor need demonstrate is that the plan "has a reasonable probability of success." Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1364 (9th Cir. 1986). The Code does not require the debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility. Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 191 (9th Cir. BAP 2003). The proposed plan must not be a "visionary scheme which promises more than the debtor can deliver." Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma), 324 B.R. 92, 112-13 (9th Cir. BAP 2005), aff'd in part, rev'd in part on other grounds, 227 F. App'x 603 (9th Cir. 2007) (citing In re Pizza of Haw., Inc., 761 F.2d at 1382).

**2.    Analysis.**

Wells Fargo argues that the bankruptcy court erred in only determining that the Plan was feasible in its first three years, and that it failed to consider feasibility for the Plan's remaining term. Because feasibility is an issue of fact, we give due regard to the bankruptcy court's evaluation of witness testimony and any inferences drawn by the court. In re Wiersma, 324 B.R. at 113. Not only does Wells Fargo misstate the bankruptcy court's findings, but our review of this issue is impeded because Wells Fargo failed to provide in its excerpts of record the transcripts containing any of the testimony from Loop

35

76's feasibility expert witness. It also failed to include the cross-examination of its own expert witness. Wells Fargo further included only snippets of the testimony from Loop 76's principals.

As appellant, Wells Fargo has the burden to provide an adequate record. In re Kritt, 190 B.R. at 386-87. Because feasibility is a finding of fact, Wells Fargo has the burden to demonstrate that the bankruptcy court's findings of fact are clearly erroneous. Gionis v. Wayne (In re Gionis), 170 B.R. 675, 681 (9th Cir. BAP 1994); Rule 8009(b); 9th Cir. BAP Rule 8006-1. To show clear error, Wells Fargo has to show how the findings were not supported by the record (i.e., the testimony and evidence upon which the court relied in issuing its ruling). "'Appellants should know that an attempt to reverse the trial court's findings of fact will require the entire record relied upon by the trial court be supplied for review.'" In re Kritt, 190 B.R. at 387 (quoting Burkhart v. Fed. Dep. Ins. Corp. (In re Burkhart), 84 B.R. 658, 661 (9th Cir. BAP 1988)). See also FRAP 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion.").

By submitting virtually only one side of the story, Wells Fargo has fallen short of meeting its burden. Therefore, we cannot confirm that the "record established" what Wells Fargo says it did (or did not). While perhaps the necessary transcripts are available on the bankruptcy court's electronic

36

docket, the Panel is not obligated to scour the record to try to make Wells Fargo's case of clear error.  <u>In re Kritt</u>, 190 B.R. at 386-87.  Based on what record Wells Fargo did provide, however, we believe it supports the bankruptcy court's feasibility determination.

Accordingly, we affirm the bankruptcy court's finding that the Plan was feasible.  <u>In re Kyle</u>, 317 B.R. at 393.

### VI. CONCLUSION

Based on the foregoing reasons, we AFFIRM.