**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. AK-14-1122-JuKiKu |
| | ) | |
| MARLOW MANOR DOWNTOWN, LLC, | ) | Bk. No. 12-00421 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| MARLOW MANOR DOWNTOWN, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | M E M O R A N D U M* |
| | ) | |
| WELLS FARGO BANK, AS SERVICING | ) | |
| AGENT FOR ALASKA HOUSING | ) | |
| FINANCE CORPORATION; CAG | ) | |
| DEVELOPMENT, LLC; ENVISION | ) | |
| INVESTORS, LLC; RISING STAR | ) | |
| INVESTMENTS, LLC, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on January 22, 2015
at Pasadena, California

Filed - February 6, 2015

Appeal from the United States Bankruptcy Court
for the District of Alaska

Honorable Herbert A. Ross, Bankruptcy Judge, Presiding

_____

Appearances:    David Hollister Bundy argued for appellant Marlow
                Manor Downtown, LLC; Gary C. Sleeper of Jermain
                Dunnagan & Owens PC argued for appellee Wells
                Fargo Bank, as Servicing Agent for Alaska Housing
                Finance Corporation.

_____

_____

* This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

-1-

Before: JURY, KIRSCHER, and KURTZ, Bankruptcy Judges.

In the third amended plan (TAP) filed by chapter 11[1] debtor Marlow Manor Downtown, LLC, debtor classified the two unsecured deficiency claims of its lender, the Alaska Housing Financing Corporation (AHFC), in class 3 and 4 as secured and unimpaired and placed them in different classes from the general unsecured creditors. Prior to plan confirmation, Wells Fargo Bank, as servicing agent for AHFC,[2] filed a motion under Rule 3013[3] (Rule 3013 Motion) seeking an order that debtor's classification of AHFC's deficiency claims was improper on the grounds that (1) the deficiency claims were unsecured and impaired and substantially similar to the claims of the general unsecured creditor class and (2) debtor failed to provide a business justification or economic reason for the separate classification. Agreeing with AHFC, the bankruptcy court entered an order granting the motion. Debtor appeals from that order. Finding no error, we AFFIRM.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] Although Wells Fargo Bank, as servicer for AHFC, filed the Rule 3013 Motion as well as other motions throughout this case, for convenience we refer to AHFC as the movant.

[3] Rule 3013 entitled "Classification of Claims and Interests" provides in relevant part:

> For the purposes of the plan and its acceptance, the court may, on motion after hearing on notice as the court may direct, determine classes of creditors and equity security holders pursuant to §§ 1122 . . . .

## I. FACTS

**A. Prepetition Events[4]**

Debtor is an Alaska limited liability company formed in 2002. Debtor's manager is Marc A. Marlow (Marlow) and its membership interests are owned by the Marlow Family Perpetual Trust (90%) and Marlow Manor Downtown TC, LLC, an Alaska limited liability company (10%).

Debtor owns a portion of the McKinley Tower, a 14-story high rise located in downtown Anchorage which was built in 1952 for residential use. At one point, the building was converted to office space and leased to the State of Alaska. A subsequent owner began converting the building into a hotel before defaulting and the lender foreclosed. Another owner all but abandoned the building before selling it to Marlow in 1998.

Marlow, a developer, planned on restoring the building to residential use. To that end, Marlow had the property legally subdivided into a two unit condominium project. Unit A, owned by EGAE, LLC[5] and an unidentified investor, was reconstructed as 100 studio and one bedroom apartments and was financed through HUD's 221 D 4 Urban Revitalization Program. Unit B, owned by debtor, was to be converted to a fifty-two unit senior assisted living home and was financed by a $5.4 million construction loan from Northrim Bank (Northrim).

---

[4] The underlying facts are undisputed. The facts were mostly taken from the second amended disclosure statement and the bankruptcy court's memorandum decisions entered October 9, 2013, and March 24, 2014.

[5] EGAE, LLC is owned by the Marlow Family Perpetual Trust.

In 2007, AHFC refinanced the majority of Northrim's loan through two long term loans in the total amount of $5.450 million. The first loan for $4.125 million was evidenced by a promissory note (First Note) and secured by a first deed of trust against Unit B and a security interest in the rents, equipment, inventory, security deposits, and other personal property. The original terms called for interest at 7.375% per year in equal monthly payments of $28,490 over a 30-year term (or, to February 1, 2037). The second loan for $1.325 million was evidenced by a promissory note (Second Note) and was secured by a second deed of trust against Unit B and a security interest in the same personal property as the First Note. The Second Note bore interest at 1.5% per year in annual installments of 40% of "available cash flow," as defined in the note, and due and payable by February 1, 2037. Marlow guaranteed both loans. After the refinancing, Northrim was left with an unsecured loan balance of $575,000.

Construction of Unit B into senior assisted living housing began in 2005. Marlow's business plan depended on most of the residents paying for their rent, meals and care through the Medicaid program for lower income and disabled persons, using federal and state funds administered by the State of Alaska. Marlow thought he could collect $127 per resident per day which was the reimbursement rate from Medicaid at the time. After food and care costs, Marlow expected that the excess income would cover operating expenses and the debt service on the First Note.

In May of 2007, the Alaska Department of Health and Social

-4-

Services reduced the Medicaid reimbursement rate to $99.37 per day, a $28 reduction from the rate on which the project had been budgeted. With an anticipated thirty residents (out of fifty units) receiving Medicaid benefits, this translated to a reduction of almost $27,000 in monthly income, an amount almost equal to the required debt service. Due to the decrease in benefits, it was no longer practical to use the project for assisted living.

Marlow decided to convert the property from assisted living units to residential rentals offered on the open market. Although the market for apartment housing without kitchens would be limited, Marlow thought that the rent would cover the operating costs with an appreciable amount remaining for debt service and a reserve for insurance and capital replacements. The assisted living residents were relocated, and Marlow began converting the property to market rate studio apartments.

Conversion costs were approximately $258,000 and it took almost two years to stabilize the rent. The only source of funds to convert Unit B to market rentals was the income from the property as units were rented, which meant that for a number of months debtor made no loan payments to AHFC.

In April 2009, AHFC agreed to a loan modification. Under the First Note, the payment terms were modified to carve out a $1 million principal portion and provide payment on two tracks. On the approximately $3.125 million portion, payments were reduced from $28,490 per month to $21,627 per month at 7.375% annual interest, still in equal monthly payments, amortized to fully pay off by February 1, 2037. On the $1 million carve out,

interest remained at 7.375% annually, but payments were made based on 30% of "available cash flow" as redefined in the modification agreement. Any unpaid balance was due on February 1, 2037. The modification did not make the $1 million carve-out junior to the $3.125 million part of the first loan, but merely described two different criteria for payment. The terms of the $1.325 million Second Note were modified to require an annual payment of 70% of "available cash flow," as redefined in the modification agreement. The interest remained at 1.5% and a balloon payment was due on February 1, 2037.

In 2011 AHFC filed a state court lawsuit to impose a receivership over the property. Debtor agreed to the appointment of a receiver. The receiver began serving in April 2012 and has been collecting the rents and disbursing funds to pay the operating expenses since then.

Early in 2012, AHFC declared debtor in default on the First Note for lack of payments. AHFC commenced a non-judicial foreclosure against the property after workout discussions between the parties did not succeed.

**B.    Bankruptcy Events**

Debtor filed its chapter 11 single asset real estate case on July 9, 2012. In Schedule D, debtor listed AHFC's Second Note as fully unsecured and the First Note as partially secured by Unit B. In Schedule F, debtor listed unsecured claims in the amount of $1.5 million consisting of trade and other debt, including the loan balance due Northrim in the amount of $575,000 and management fees owed to NANA Management Services (NANA) in the amount of $500,000.

Soon after the filing, AHFC moved for relief from stay. At the preliminary hearing on its motion, AHFC agreed to waive the ninety-day time limit for debtor to file a plan under § 362(d)(3)(A). The bankruptcy court extended the time for debtor to file its plan and disclosure statement. On October 18, 2012, debtor filed its plan of reorganization.

Meanwhile, the parties attended a mediation which resulted in a number of agreements. The parties agreed, among other things, that the receiver would remain in place and continue to disburse monies monthly to AHFC as set out in the receivership order and in the cash collateral order entered by the bankruptcy court. The parties also agreed to continue the final hearing on AHFC's motion for relief from stay and the confirmation hearing, both scheduled for November 7, 2012.

Debtor filed a first amended plan on March 30, 2013. The scheduled confirmation hearing for that plan was vacated to allow debtor to file a second amended plan (SAP).

**1.  The SAP**

Debtor filed its SAP on July 7, 2013. In that plan, debtor placed AHFC's various claims into classes 2, 3, and 4:

**Class 2 - AHFC's secured First Note claim.** As of the petition date, AHFC's First Note claim had an outstanding balance of $4,391.545.20. Debtor assigned a present value of $2.7 million to the secured portion of AHFC's First Note claim and gave AHFC the option to elect to have its class 2 claim treated as fully secured under § 1111(b). This claim was impaired.

**Class 3 - AHFC's unsecured deficiency First Note claim.** If AHFC did not elect to have its class 2 claim treated as fully secured under § 1111(b), debtor proposed making $10,000 quarterly payments on the unsecured deficiency First Note claim beginning October 1, 2018, and continuing for five years until a total of $200,000 was paid. The SAP stated that debtor would not be required to make further payments on this claim. This class was impaired.

**Class 4 - AHFC's unsecured deficiency Second Note claim.** As of the petition date, the outstanding balance owed on the Second Note was $1.325 million. Debtor proposed to pay this unsecured deficiency claim in the amount of $250,000, without interest, in quarterly installments of $10,000 beginning October 1, 2023. This claim was impaired.

Class 6 consisted of general unsecured claims. The allowed class 6 claims would share pro rata a $20,000 distribution on the effective date of the plan and thereafter quarterly payments of $10,000 commencing October 1, 2013, for a period of five years, with the final payment made on July 1, 2018.

AHFC voted to reject the plan as did class 6 unsecured creditors, Northrim and NANA, who controlled the class vote. As a result, debtor did not have an impaired class that accepted the plan. After the voting, a business associate of Marlow's purchased Northrim's claim. Debtor subsequently filed a motion under Rule 3018 seeking to change Northrim's vote on the SAP.

At the same time, AHFC filed an objection to confirmation of the SAP arguing, among other things, that debtor's placement of AHFC's class 4 unsecured deficiency Second Note claim in a

-8-

different class from the class 6 unsecured claims was improper. AHFC asserted that its Second Note unsecured claim was substantially similar to the general unsecured claims and that debtor had no business or economic justification for the separate classification.

AHFC also filed a Rule 3013 Motion, seeking an order that the classification of AHFC's unsecured deficiency Second Note claim in class 4 was improper on the same basis. Debtor opposed the motion, arguing that AHFC's unsecured debt in connection with the Second Note was not substantially similar to the general unsecured claims on the basis that the payment terms under the Second Note distinguished the debt from the debt owed to the general unsecured creditor class. According to debtor, the Second Note, as modified in 2009, did not require any debt service unless the property had sufficient cash flow. If there was not adequate cash flow, then no payment was required and the deferred interest would be added to the balloon payment due in 2037. Citing several tax cases, debtor maintained that the payment terms under the Second Note had the character of a redeemable preferred stock or similar equity investment which receives a dividend only if the issuer has the ability to pay.

On October 9, 2013, the bankruptcy court issued a memorandum decision granting AHFC's Rule 3013 Motion. The bankruptcy court found that the separate classification of AHFC's Second Note deficiency was not proper for several reasons.

First, the court decided that debtor's attempted separate classification of the unsecured deficiency Second Note claim was

a "disfavored attempt to manipulate the voting on the plan to meet the confirmation standard of having at least one class of non-insider claims approve the plan" — i.e., gerrymandering.

Second, the court found no special circumstances that warranted the separate classification under the holding in *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994). In *In re Johnston*, the Ninth Circuit affirmed the separate classification of an unsecured creditor's claim because its claim was partially secured by collateral of a nondebtor company. Further, the creditor was embroiled in litigation with Johnston and therefore its claim might be offset or exceeded by Johnston's own claim against the creditor, and if the creditor was successful in litigation, it could be paid in full before all other unsecured creditors. *In re Johnston*, 21 F.3d at 327. The bankruptcy court effectively distinguished *In re Johnston* from the facts in this case stating:

> Although Marlow was a guarantor on the loan, he is apparently not personally solvent and has many unpaid money judgments against him. He is not like the creditor in *Johnston*, which had viable guarantors to collect from, at least in part. Nor is there any other collateral than the real and personal property securing the two loans owed to AHFC, valued at no more than $2.7 million.

Next, relying on *Barakat v. The Life Ins. Co. (In re Barakat)*, 99 F.3d 1520 (9th Cir. 1996), the bankruptcy court noted that while it was possible to classify similar claims in different classes, there were limits to that right. Separate classification cannot be used to "gerrymander an affirmative vote on a reorganization plan" and, if claims are substantially similar, there must be a valid business or

-10-

economic reason for the separate classification. *Id.* at 1527. The bankruptcy court concluded that AHFC's unsecured deficiency Second Note claim was substantially similar to the separately classified, noninsider unsecured creditor claims:

> The claim on the second promissory note is very similar to a garden variety unsecured claim, notwithstanding its 'easy terms.' [Section] 502(b)(1) makes the claim presently allowable despite being an unmatured claim, the balance of which is due in 2037. Also, under the terms of the second loan agreement, the second promissory note can be accelerated due to the default under the first promissory note. And, even if [sic] second promissory note had been nonrecourse (which it is not), in chapter 11 it is treated as a recourse claim.

The court also decided that debtor offered no satisfactory business or economic reason for the separate classification of the substantially similar claims. The bankruptcy court rejected debtor's argument that AHFC should bear some of the responsibility for the failure of Marlow's plan to develop Unit B into an assisted living center. Noting that AHFC was a completely distinct entity from the entity that changed the Medicaid subsidies, the bankruptcy court observed that both debtor and AHFC had the "rug pulled out from under them" due to the change in projected Medicaid subsidies.

Finally, the bankruptcy court was not persuaded by debtor's argument that the Second Note was akin to an equity contribution.

Due to the court's ruling, it found it unnecessary to address the merits of debtor's motion under Rule 3018 seeking to change Northrim's vote on the SAP.

### 2. The TAP

On November 12, 2013, debtor filed the TAP. According to

-11-

debtor, the classification of AHFC's claims in the TAP recognized that through the modification agreement, AHFC and debtor in effect turned the original two loans into three: (1) under the First Note, monthly installment payments were due on $3.125 million; (2) under the First Note, the $1 million carve out required payments only from cash flow; and (3) under the Second Note, payments on the $1.325 million were required only from cash flow. Following these payment terms, debtor placed AHFC's claims in class 2, 3, and 4:

**Class 2 - Secured Claim of AHFC.** Debtor stated AHFC's secured claim was for $3.125 million, with interest at 5.75%, and payments would be made in monthly installments (after a $30,000 payment on the effective date), increasing at various intervals to June 1, 2037 (this apparently represents the $3 million portion of the First Note, as defined by the modification agreement). This claim was impaired.

**Class 3 - the $1 million carve out from the First Note.** Debtor labeled this claim as secured and if AHFC did not make an election under 1111(b) then debtor would pay this claim in accordance with the terms of the modification agreement. The plan further provided that the maturity of this claim — as such maturity existed prior to any default — "shall be reinstated." In addition, the plan stated that no payment of any cure amount or on account of any damages incurred as a result of any prepetition default shall be required. Because debtor was proposing to pay this claim according to its terms, debtor labeled this class as unimpaired and deemed to have accepted the plan.

-12-

**Class 4 - the $1.325 million owed on the Second Note.** Again, debtor labeled this deficiency claim as secured and stated that it would be paid in accordance with the terms of the modification agreement. This class was also described as not impaired and "deemed to accepted the plan."

On January 17, 2014, AHFC filed its second Rule 3013 Motion seeking to have the bankruptcy court find that its unsecured deficiency claims in classes 3 and 4 were improperly classified as secured and unimpaired. AHFC also argued that its deficiency claims should be placed with the substantially similar general unsecured claims in class 6 due to the bankruptcy court's previous ruling in connection with the SAP.

Debtor opposed, arguing that it was offering to repay the two loans exactly as required by the loan documents and thus class 3 and 4 were not impaired and were not entitled to vote for or against the TAP. Debtor further argued that the business reason for separate classification was based on the specific terms of the modification agreement, which carved out $1 million from the First Note, and the terms of the $1.325 million Second Note, neither of which required any debt service unless the property had sufficient cash flow. By limiting debt service to debtor's positive cash flow, debtor argued that AHFC subordinated a total of $2.325 million of its loans to debtor's operating expenses and to debt service on the balance of the First Note. The subordination of the two debts, according to debtor, created a substantially different economic treatment of the loans from that of the debts owed to general unsecured creditors.

-13-

On March 5, 2014, the bankruptcy court heard the matter. The court questioned debtor's counsel about the purpose behind classifying AHFC's deficiency claim separately in class 4 even though it previously ruled that separate classification was improper.

> THE COURT: And the purpose of doing that is to take it out of the voting so it would be deemed to be unimpaired?

> MR. BUNDY: Right. That is the purpose. And the same with the Class 3 claim. As now indicated, the million dollars would be treated as unimpaired and wouldn't get to vote either. If the court rules that we can't do that and we have to put all these claims together because there's no collateral value for . . . Class 3 and 4 at this point, then, you know, the plan doesn't work, and we concede that.

In the end, the court found that AHFC's deficiency claims in class 3 and 4 were improperly classified as secured and unimpaired when they were both unsecured and impaired. The bankruptcy court entered an order granting AHFC's Rule 3013 Motion and debtor timely appealed.

On March 24, 2014, the bankruptcy court issued a memorandum decision which elaborated on its March 5th oral ruling. The court explained that class 3, the $1 million carve out from the $4.125 million First Note and its collateral, and class 4, the junior $1.325 million Second Note with the same collateral, were improperly classified as secured and unimpaired when they were both unsecured and impaired. The court further stated that AHFC's class 2 claim (the $3.125 million portion of the First Note) was listed as secured up to the full value of the collateral and was classified by debtor as being impaired. As a simple mathematical proposition, the bankruptcy court reasoned

-14-

that class 3 and 4 could not be secured under § 506(a) since class 2 used up all the collateral value.[6]

The bankruptcy court also concluded that AHFC's classes 3 and 4 claims were improperly classified as unimpaired because the rights of AHFC in each class were modified. Although debtor claimed that the payment terms of classes 3 and 4 were left unchanged, the court found that the TAP made changes in AHFC's contract rights which ipso facto were an impairment.

Finally, the bankruptcy court observed that it had previously ruled that separately classifying AHFC's general unsecured deficiency Second Note claim from other general unsecured creditors in debtor's SAP was improper gerrymandering for the purpose of obtaining the affirmative vote of at least one class so it could possibly confirm a cramdown plan. For the same reasons set forth in its previous ruling, the court found there was no business or economic reason to classify AHFC's unsecured deficiency claims in class 3 and 4 in the TAP separately from the other general unsecured class 6 creditors.

On April 22, 2014, the BAP clerk's office issued an order regarding finality, indicating that the order on appeal did not appear final and requiring a response from appellant. After receiving the response, the Panel entered an order granting debtor leave to appeal to the extent it was necessary.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C.

---

[6] The bankruptcy court did not hold a valuation hearing nor were appraisals submitted regarding the value of the property.

§§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

Whether the bankruptcy court erred by finding that the classification of AHFC's deficiency claims was improper on the bases that:

    A.    The deficiency claims were unsecured and impaired;

    B.    The deficiency claims were substantially similar to the general unsecured class 6 creditor claims; and

    C.    Debtor offered no business justification or economic reason for the separate classification.

## IV. STANDARDS OF REVIEW

Whether a claim is impaired under § 1124 is a question of law, subject to de novo review. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1357-58 (9th Cir. 1986).

Whether claims are "substantially similar" under § 1122(a) is a question of fact; a bankruptcy court has broad latitude in making this determination, which is reviewed for clear error. *In re Johnston*, 21 F.3d at 327. A factual finding is clearly erroneous if it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *Retz v. Sampson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

## V. DISCUSSION

**A.    The bankruptcy court did not err in finding that AHFC's deficiency claims were unsecured and impaired.**

In its opening brief, debtor concedes that AHFC's deficiency claims under the First Note and Second Note are

unsecured under § 506(a). Section 506(a) divides a creditor's claim into "secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 961 (1997). Here, debtor assigned a value of $2.7 million to AHFC's secured First Note claim. Therefore, as noted by the bankruptcy court, simple math confirms that AHFC's deficiency claims under the First Note and the Second Note are unsecured. Accordingly, debtor's classification of AHFC's unsecured claims as secured is in direct violation of § 506(a).

As the holder of both a secured and unsecured claim, AHFC is entitled to vote on debtor's plan in both capacities. Because the TAP treats AHFC's unsecured deficiency claim on the First Note as fully secured even though AHFC is an undersecured creditor, the plan improperly treats AHFC as if AHFC had made the § 1111(b)(2) election. However, the decision whether to make the § 1111(b)(2) election is controlled solely by the creditor. *Montclair Retail Ctr., L.P. v. Bank of the W. (In re Montclair Retail Ctr., L.P.)*, 177 B.R. 663, 666 (9th Cir. BAP 1995). Accordingly, debtor's classification of AHFC's unsecured deficiency claim under the First Note as secured is in direct violation of § 1111(b).

Debtor also maintains, without analysis, that AHFC's deficiency claims in classes 3 and 4 are unimpaired under § 1124 on the basis that it is making the same payments to AHFC as those required under the modification agreement. Section 1124(2) states that a class of claims or interests is impaired, and thus entitled to vote, unless the treatment in the

-17-

plan of those claims or interests, notwithstanding any right to demand accelerated payment upon default: (A) cures the default, (B) reinstates the maturity of the claim or interest, (C) compensates the claim or interest holder for damages for relying on the acceleration clause, (D) compensates for nonmonetary defaults, and (E) "does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder."  If a plan can satisfy these requirements, that claim or interest holder will not be considered impaired.

Nowhere does debtor discuss these requirements, instead arguing that the bankruptcy court did not explain how the deficiency claims were impaired.  However, the record shows that the court supported its finding by citing AHFC's brief filed in support of its second Rule 3013 Motion.  There, AHFC argued that debtor was in default on the First and Second Notes.  Accordingly, debtor was obligated to AHFC for missed payments and for substantial costs and attorney's fees.  As noted by AHFC, the TAP specifically provides that the defaults will not be cured.  Thus, § 1124(2)(A) has not been met.

Moreover, the modification agreement entitles AHFC to receive annual payments on the $1 million carve out and Second Note in an amount equal to 100% of debtor's available cash flow. Instead of paying AHFC the available cash flow, the TAP will use it to pay general unsecured creditors.  Therefore, the TAP

alters AHFC's contractual rights under § 1124(2)(E).[7]

Accordingly, the bankruptcy court did not err in concluding that AHFC's unsecured deficiency claims in classes 3 and 4 were impaired under § 1124(2).

**B. The bankruptcy court did not err in finding that the separate classification of AHFC's unsecured deficiency claims was improper.**

Section 1122(a) provides that, except as provided in subsection (b), which is not relevant here, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

The Ninth Circuit has a two-step analysis for determining whether claims have been permissibly separated into different classes. *Wells Fargo Bank, N.A. v. Loop 76 LLC (In re Loop 76, LLC)*, 465 B.R. 525, 536-37 (9th Cir. BAP 2012). First, the trial court should determine whether the claims are substantially similar, and second, if so, whether there is a business justification for separately classifying them. *Id.* If

---

[7] Debtor's third amended disclosure statement provides that payments and distributions under the plan will be funded by the following:

Payments to creditors will come from cash on hand, collections of receivables, and ongoing revenue. Payments on the Class 3 and 4 claims will come mostly from refinancing or sale of the Property on maturity of the Claims in 2037.

The financial projections show that the Debtor will have sufficient income to make the required payments on the Class 2 claim of AHFC and the Class 6 unsecured claims. . . .

the claims are not substantially similar, their separate classification is not only permissible, but required under § 1122(a). If the claims are substantially similar, that implicates the gerrymandering concern, but the debtor may still separately classify them "if the debtor can show a business or economic justification for doing so." *Id.* The bankruptcy court has broad discretion in classifying claims under § 1122. *In re Johnston*, 21 F.3d at 327.

Here, the bankruptcy court evaluated AHFC's deficiency claims under the same analysis as the Ninth Circuit did in *In re Johnston* and *In re Barakat* and found no distinguishing characteristics rendering them dissimilar to the general unsecured claims. The court found Marlow, the guarantor, was not a source of recovery for AHFC's deficiency claims because he was insolvent and had multiple judgments against him. Finding no special circumstances, the bankruptcy court concluded that AHFC's unsecured deficiency claims were "garden variety" unsecured claims.

Debtor's attempt to use the contract payment terms under the modification agreement as a distinguishing characteristic for classification purposes is disingenuous at best when debtor proposes to use its available cash flow to pay unsecured creditors rather than AHFC. Further, the contractual payment terms under the modification agreement do not alter the legal character of AHFC's unsecured deficiency claims warranting separate classification. AHFC's unsecured deficiency claims and general unsecured trade claims enjoy similar rights and privileges within the Bankruptcy Code. Accordingly, the

-20-

bankruptcy court's factual determination that AHFC's unsecured deficiency claims were substantially similar to those of the unsecured creditors in class 6 was not clearly erroneous.

We also agree with the bankruptcy court's assessment that debtor has pointed to no legitimate business or economic reason for the separate classification of AHFC's deficiency claims. Debtor has all but admitted that the separate classification of AHFC's deficiency claims as secured and unimpaired was to prevent AHFC from voting against the plan.

> [S]eparate classification for the purpose of preventing the undersecured creditor from rejecting the plan is contrary to the principles underlying the Bankruptcy Code, that is, that creditors holding greater debt should have a comparably greater voice in reorganization. . . . Although [this] will effectively bar single asset debtors from utilizing the Bankruptcy Code's cramdown provisions, the court was not persuaded that a single-asset debtor should be able to cramdown a plan that disadvantages the largest creditor. Thus, absent a legitimate business or economic reason, separate classification is not permitted.

*In re Barakat*, 99 F.3d at 1526 (internal citations omitted). Accordingly, the bankruptcy court did not err in finding that debtor's classification of AHFC's deficiency claims in classes 3 and 4 was improper.

## VI. CONCLUSION

For the reasons stated, we AFFIRM.

-21-