# FILED

DEC 02 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No. EC-15-1202-KuMaJu |
| ) | |
| KEYSTONE MINE MANAGEMENT II, ) | Bk. No. 13-16845 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| KEYSTONE MINE COMPANY, LTD; ) | |
| KEYSTONE MINE MANAGEMENT, LTD.;) | |
| KIRK L. DUSHANE; ROGER SMITH; ) | |
| PATRICK O'BRIEN, ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| VINCENT A GORSKI, Chapter 7 ) | |
| Trustee; BUSH MANAGEMENT ) | |
| COMPANY; KEYSTONE MINE ) | |
| MANAGEMENT II, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on October 20, 2016
at Sacramento, California

Filed – December 2, 2016

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable W. Richard Lee, Bankruptcy Judge, Presiding

Appearances: Meir J. Westreich argued for the appellants; Lisa Anne Holder of Klein Denatale Goldner Cooper Rosenlieb & Kimball, LLP argued for appellee Vincent A. Gorski, Chapter 7 Trustee; Charles A. Bird of Dentons US LLP argued for appellee Bush Management Company.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

Before: KURTZ, MARTIN[**] and JURY, Bankruptcy Judges.

## INTRODUCTION

The appellants herein are all creditors or equity interest holders of the debtor Keystone Mine Management II. Over the course of roughly 14 months, they opposed every step the chapter 7[1] trustee Vincent A. Gorski attempted to take to liquidate the debtor's assets and reduce them to cash, in accordance with his duties under § 704(a).

Ultimately, the bankruptcy court approved Gorski's proposed sale and compromise transaction with Bush Management Company, pursuant to which Bush purchased all of Keystone Mine Management II's assets. The bankruptcy court's bidding procedures order provided interested parties with an opportunity to make competing bids for the assets, but no competing bids were made, even though Gorski had advertised the sale of the assets for a number of months.

Appellants appealed both the bankruptcy court's bidding procedures order and its sale order, but they did not obtain a stay pending appeal. In addition, the bankruptcy court made ample findings to support its determination that Bush was a good faith purchaser and was entitled to the benefit of § 363(m), which prevents appellate courts from disturbing the validity of a bankruptcy sale even when the appellant prevails on appeal. The

[**]Hon. Brenda K. Martin, United States Bankruptcy Judge for the District of Arizona, sitting by designation.

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

2

bankruptcy court's findings related to Bush's good faith were not clearly erroneous, so § 363(m) applies; it renders moot the appellants' appeals from the bidding procedures order and the sale order.

The appellants also have appealed from the bankruptcy court's order approving the compromise aspects of the transaction between Gorski and Bush. Under the particular circumstances of this case, we decline to hold that § 363(m) applies to the compromise order. Even though § 363(m) has not rendered moot the appeal from the compromise order, the appellants did not include in their appeal brief any arguments specifically and distinctly challenging the compromise order. Nor did they order a transcript of the final compromise hearing, at which the bankruptcy court stated its findings of fact and conclusions of law orally on the record. As a result, we have not been presented with (nor are we aware of) any grounds that would justify reversal of the court's compromise order.

Accordingly, we DISMISS AS MOOT the appeals from the bankruptcy court's bidding procedures order and its sale order. The compromise order is AFFIRMED.

**FACTS**

The litigation history surrounding Keystone Mine Management II's bankruptcy case is voluminous, but most of that history need not be recounted here in order to dispose of this appeal.

**1. Key Parties**

We start with the key parties. At all relevant times before the appointment of Gorski as chapter 7 trustee, Kirk DuShane had been serving as the manager of the debtor and its two affiliates:

3

Keystone Mine Management, Ltd. ("KMM") and Keystone Mining Company ("Company"). Debtor ("KMM II") is a limited partnership in which KMM holds a 60% partnership interest and DuShane holds a 40% partnership interest. In turn, Company nominally is the general partner of KMM, but DuShane is Company's general partner, pursuant to which he exercised management control over all three entities.

The other two named appellants – Patrick O'Brien and Roger Smith – are, respectively, an accountant and a geologist who have provided services over the years to the Keystone entities and who claim to be creditors and/or equity investors in one or more of these entities.[2]

The Keystone entities' only significant assets consisted of some mining equipment, 44 mining claims and 4 mill site claims granted by the U.S. Bureau of Land Management, which claims entitled the Keystone entities to conduct mining and milling operations on the applicable U.S. government land.

William Weyerhaeuser is the sole trustee of a trust which, over several years, beginning in 1988, lent the Keystone entities roughly $2.6 million and received in exchange a deed of trust encumbering 20 of the mining claims and a security interest in the mining equipment. Weyerhaeuser's trust also made a $500,000 equity investment in the Keystone entities in 1989.

John Hagestad was a relatively minor equity investor in the

_____

[2]For ease of reference, our recitation of facts sometimes refers to the appellants as "DuShane and the non-debtor Keystone entities" because they are the most involved participants on behalf of the appellants. No disrespect is intended to O'Brien or Smith.

4

Keystone entities who, in addition, loaned $60,000 directly to DuShane. In 2012, Hagestad filed a state court lawsuit against DuShane and KMM II, which lawsuit ultimately led to DuShane filing a chapter 11 bankruptcy petition on behalf of KMM II in October 2013.[3] Hagestad also owns and controls a company known as Bush Management Company. In June 2014, after KMM II commenced its bankruptcy case, Bush acquired all of the Weyerhaeuser trust's loan and lien rights arising from the Weyerhaeuser trust's loans to the Keystone entities. By way of Bush's acquisition of the Weyerhaeuser trust's rights and interests, Hagestad transformed himself from a minor equity investor into the Keystone entities' sole significant secured creditor.

Gorski is the duly-appointed chapter 7 trustee for KMM II. Almost immediately after he was appointed (in February 2014), he commenced efforts to liquidate the estate's assets by proposing to sell those assets to Bush.

**2. Gorski's Efforts to Sell the Keystone Assets**

Over the course of a year and a half, Gorski persistently sought to sell the mine and mill site claims and the mining equipment on behalf of KMM II's bankruptcy estate. At each step of the way, DuShane and the non-debtor Keystone entities vigorously opposed the trustee's sales efforts. Initially, before the Weyerhaeuser trust sold its loan and lien rights to Bush, Gorski filed a motion seeking to sell the Keystone assets to Bush free and clear of all liens and interests, including

---

[3]The bankruptcy court converted KMM II's bankruptcy case from chapter 11 to chapter 7 in February 2014.

Weyerhaeuser's loan and lien rights, which Gorski at the time believed were subject to legitimate dispute.

DuShane and the non-debtor Keystone entities opposed Gorski's first sale motion largely on the ground that the $250,000 proposed sale price was – according to them – grossly inadequate and the trustee's marketing efforts were grossly inadequate. According to DuShane and the non-debtor Keystone entities, Gorski should have been marketing the assets for somewhere between $10 million and $20 million, not including royalty payments.[4]

In June 2014, after the bankruptcy court continued the hearing on Gorski's first sale motion, Bush acquired the Weyerhaeuser trust's loan and lien rights and expressed to Gorski its desire to credit bid for the Keystone entities' assets. The trustee initially maintained that the loan and lien rights were still subject to dispute and that Bush's request to credit bid should be restricted or prohibited.

However, by September 2014, Gorski had changed his mind regarding the validity of Bush's loan and lien rights. By then, Gorski had completed his review and analysis of Bush's proof of claim, in which Bush asserted its rights as the successor to the Weyerhaeuser trust's loan and lien rights. In light of his complete review and analysis, Gorski reached a new agreement with

[4]It is somewhat difficult to reconcile the Keystone entities' asserted market value with: (1) the Keystone entities' admission that tens of millions of dollars in capital investment were necessary before the mining and milling operations could be rendered fully operational; and (2) the apparently undisputed fact that the Keystone entities had not been able to adequately capitalize or operate the mines and mill sites for decades.

6

Bush for the sale of the Keystone assets and for the allowance of Bush's secured claim in the amount of $8.1 million.

The proposed agreement additionally contemplated a complex set of bidding procedures aimed at permitting Bush to credit bid while at the same time attempting to minimize the chilling effect Bush's credit bidding might have on competing bids. Under the agreed bidding procedures, the Keystone assets were broken into two groups: Group A – consisting of those assets over which Bush held lien rights – and Group B – consisting of those assets over which Bush held no lien rights. The Group A assets were subject to an initial Bush credit bid of $500,000 and, if the Group A assets were subject to competing overbids, Bush was permitted to credit bid up to 50% of its $8.1 million allowed secured claim. To the extent Bush's bid exceeded 50% of its allowed secured claim, the bid would be considered a cash bid subject, however, to offset against the remainder of its allowed secured claim. On the other hand, the Group B assets were subject to an all cash sale pursuant to which Bush committed to an initial bid of $250,000.

In furtherance of his newly-proposed sale and compromise transaction with Bush, Gorski filed his first bidding procedures motion and his first compromise approval motion. Meanwhile, Bush filed a motion for relief from stay seeking – in the event Gorski's proposed sale and compromise failed to occur by January 15, 2015 – court authorization to proceed with foreclosure pursuant to its lien rights.

In support of the compromise approval motion, Gorski submitted a declaration specifically identifying many of the

7

issues regarding the validity of Bush's loan and lien rights and generally explaining why the trustee determined that the compromise and sale transaction was in the best interests of the KMM II bankruptcy estate. In essence, after fully reviewing and analyzing the arguments challenging Bush's loan and lien rights, and after reviewing the documentation supporting Bush's proof of claim, Gorski concluded that none of the arguments challenging Bush's loan and lien rights had any merit. Gorski then summarized his reasoning why he believed that the compromise and sale transaction should be approved, as follows:

> Because the settlement with [Bush] allows me to sell the Mining Claims, including [Bush's] collateral, without the need to file an adversary proceeding to determine the nature, extent, and validity of [Bush's] Debt and lien, limits [Bush's] credit bid to a low opening amount, provides other cash and economic benefits to the Bankruptcy Estate, and sets a cap on [Bush's] credit bid as a maximum of 50% of its claim, I believe that the settlement should be approved as being in the best interest of the creditors and the estate.

Gorski Decl. (Sept. 4, 2014) at ¶¶ 7-8.

Additionally, Gorski described the arm's-length nature of his negotiations with Bush:

> The settlement was negotiated at arm's length between [Bush] and me through a lengthy and vigorous give-and-take process. It took weeks of negotiation, dozens of emails, and multiple telephone conference calls between [Bush's] attorney, representative, me, and my attorney, and the provision by [Bush] of a 149 page proof of claim, to reach resolution. Every possible challenge was raised to [Bush's] Debt and lien, and was thoroughly analyzed. Debtor has challenged every action by me related to [Bush] as a buyer, and [Bush] as creditor and lien holder.

Id. at ¶ 13.

To bolster Gorski's proposed sale and compromise, Bush filed a detailed legal memorandum asserting that all of the challenges

8

to its loan and lien rights lacked merit.

At the October 2014 hearing on Gorski's and Bush's motions, the bankruptcy court indicated that it was not prepared to grant relief as requested in any of the motions unless and until the parties resolved a pending dispute regarding which of the Keystone entities was entitled to legal title over the Keystone assets. The court noted that the title dispute was the subject of a pending adversary proceeding (Adv. No. 14-1112), denied Bush's relief from stay motion without prejudice and suspended Gorski's motions pending a final resolution in the adversary proceeding.

In April 2015, after the court resolved the title dispute in favor of Gorski and against DuShane and the non-debtor Keystone entities, Gorski resumed his efforts to obtain bankruptcy court approval of his sale and compromise with Bush. Gorski filed a new compromise motion and a new bidding procedures motion. For purposes of this appeal, these two motions did not materially differ from the motions Gorski had filed in September 2014. Gorski also filed a new sale motion. In support of the sale motion, Gorski detailed his marketing efforts, as follows:

> 8. I advertised the sale of the mining-related assets with:
>
> (a) the International Mining Journal (both print and on-line publications (icmj.com)), which have run continuously since September 2014 (see Exhibit "M" to the Supplemental Exhibits in Support of the Motion);
>
> (b) minelistings.com which has run continuously since July 2014 (see Exhibit "N" to the Supplemental Exhibits);
>
> (c) Junior Miners (juniorminers.com/gold-mining-claims-for-sale.html) which has run continuously since July 2014 (see Exhibit "O" to the Supplemental

9

Exhibits);

(d) National Association of Bankruptcy Trustees (marketassetsforsale.com), which was posted in May 2014 (see Exhibit "P" to the Supplemental Exhibits); and

(e) Loopnet.com, a real estate listing service, which was posted in May 2014 (see Exhibit "Q" to the Supplemental Exhibits).

I advanced all marketing costs. All online ads pour-over to my firm's website, where voluminous information is posted: http://www.thegorskifirm.com/#!bankruptcy-sales/c18d4 According to the counter on my website, the page has 1,257 hits. (See Exhibit "R" to the Supplemental Exhibits).

9. I reviewed Alibaba.com and found no listings for gold mining claims – although there were listings for gold mining equipment. I determined Alibaba.com was not an appropriate marketing vehicle for Debtor's mining-related assets. My review of The Northern Miner indicated it does not offer classified ads.

10. I also worked to find a broker to list the mining claims. I contacted two real estate brokerage firms (one in Bakersfield and one in Ridgecrest), and requested referrals when those firms could not assist [me]. Even so, I did not find a broker who dealt in unpatented BLM mining claims such as those owned by debtor.

Gorski Decl. (June 25, 2015) at ¶¶ 8-10.

DuShane and the non-debtor Keystone entities, once again, opposed Gorski's motions. According to the appellants, Gorski incorrectly had concluded: (1) that the arguments challenging Bush's loan and lien rights had no merit; and (2) that Bush should be permitted to credit bid for the Keystone assets while its loan and lien rights remained the subject of bona fide dispute. Furthermore, the appellants argued, Hagestad's efforts to acquire (through Bush) Keystone's assets constituted a breach of his fiduciary duties to his fellow Keystone partners. They further maintained that the assets should be marketed for at

10

least 90 days – free of any credit bid by Bush to potentially chill competing bidders.

**3.  The Bankruptcy Court's Rulings**

In June 2015, the bankruptcy court granted Gorski's bidding procedures motion, thereby permitting Bush to bid up to 50% of its allowed secured claim.  And in July 2015, the bankruptcy court granted Gorski's sale motion and his compromise motion. Because no one else bid for KMM II's assets, Bush was the successful bidder and purchaser of KMM II's assets.

The bankruptcy court issued a memorandum decision in which it made a number of factual findings in support of its determination in favor of the sale.  Among other things, the bankruptcy court found that the sale was in the "best interest of the estate and its creditors," "was fair and reasonable" under the circumstances, "was negotiated and proposed in good faith," "was subject to competitive bidding at the hearing" and was "the result of an arm's length transaction between the parties after lengthy negotiations."

The court additionally found that the trustee had adequately marketed KMM II's assets and had fully complied with the procedures set forth in the sale motion and in the bidding procedures order.

Furthermore, the bankruptcy court noted that the proposed sale was the only currently-available means for the estate to realize any value from the estate's assets and that a failure to approve the sale would almost certainly lead to Bush obtaining relief from stay and foreclosing on the estate's most valuable assets.  Even more to the point, the court opined that, without

11

the sale, the trustee likely never would acquire any funds for distribution to creditors.

As for Bush, the court found that it qualified as a good faith purchaser under § 363(m) and that the consideration to be paid by Bush was "fair and reasonable" under the circumstances, was the "highest or best offer for the assets," and constituted "reasonably equivalent value."

Moreover, the court pointed out that neither the trustee nor any of the parties objecting to the sale had commenced any action to challenge Bush's lien rights or to object to Bush's proof of claim. As a result, the court determined that Bush's proof of claim was prima facie valid under Rule 3001(f) and deemed allowed under § 502(a). The court thus concluded that there was no bona fide dispute as to Bush's loan or lien rights.

DuShane and the non-debtor Keystone entities timely appealed the bidding procedures order, the sale order and the compromise order.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(N). Except as otherwise indicated below, we have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1. Do the appellants have standing to appeal?

2. Is this appeal moot?

3. To the extent the appeal from the compromise order is not moot, have the appellants presented us with a sufficient record and briefing that would enable us to reverse the bankruptcy court's compromise order?

**STANDARDS OF REVIEW**

The appellants' standing is a question of law we consider de novo. Menk v. LaPaglia (In re Menk), 241 B.R. 896, 903 (9th Cir. BAP 1999).

The bankruptcy court's determination that Bush qualified as a good faith purchaser for purposes of § 363(m) is a finding of fact reviewed for clear error. Adeli v. Barclay (In re Berkeley Delaware Court, LLC), 2016 WL 4437616, *4 (9th Cir. 2016); Thomas v. Namba (In re Thomas), 287 B.R. 782, 785 (9th Cir. BAP 2002). A finding of fact is not clearly erroneous unless it is illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

**DISCUSSION**

**1. Appellate Standing**

The appellants lack appellate standing unless they were directly and adversely affected pecuniarily by the orders on appeal. Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 442 (9th Cir. 1983); Cheng v. K & S Diversified Invs., Inc. (In re Cheng), 308 B.R. 448, 455 (9th Cir. BAP 2004), aff'd, 160 Fed.Appx. 644 (9th Cir. 2005); In re Menk, 241 B.R. at 917. Gorski and Bush argue on appeal that the appellants do not satisfy this "person aggrieved" standard because there is no practicable means by which appellants, under any scenario, reasonably could expect any distribution from the KMM II bankruptcy estate. According to Gorski and Bush, the estate is administratively insolvent, and the appellants, as unsecured creditors and/or equity interest holders in KMM II, consequently have no prospect of receiving any distribution regardless of the

13

efficacy of the orders on appeal.

It is true that, when an appellant's chances of receiving a distribution from the bankruptcy estate are hopeless, the appellant may lack standing to appeal orders affecting the size of the bankruptcy estate. See In re Fondiller, 707 F.2d at 442; see also Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774, 778 n.2 (9th Cir. 1999). That being said, Gorski's and Bush's standing argument assumes that Bush's secured claim is valid and unassailable for purposes of determining the appellants' standing. In other words, Gorski and Bush seek to deny the appellants a merits determination on the primary issue the appellants seek to raise on appeal – the enforceability of Bush's loan and lien rights.

Admittedly, the reasons Gorski and Bush offer about why the enforceability of Bush's loan and lien rights are not properly at issue in this appeal are compelling. As Gorski and Bush point out, the appellants never objected to Bush's claim, never commenced an adversary proceeding challenging Bush's loan and lien rights, and never took any other action they might have taken to place Bush's loan and lien rights squarely at issue before the bankruptcy court.

Gorski and Bush contend that, as a result of the appellants' failures, the appellants should be determined to lack bankruptcy appellate standing. But we are not convinced. The same points that Gorski and Bush make in their appellate standing argument can be considered, if necessary, in addressing the merits of the appellants' appeal. Indeed, the appellants' failure in the bankruptcy court to squarely place at issue Bush's loan and lien

14

rights ultimately might be fatal to their appeal, but we don't think that this failure should deprive them of appellate standing.

Our decision not to dismiss these appeals on appellate standing grounds is supported by the fact that the appellate standing doctrine is not a constitutional mandate but rather is a prudential, judge-made rule applied in the interests of judicial economy and efficiency. See generally In re P.R.T.C., Inc., 177 F.3d at 778 (describing nature of appellate standing doctrine). In light of the circumstances described immediately above, we decline to dismiss these appeals on appellate standing grounds.

**2.   Application of Section 363(m) and Mootness**

Gorski and Bush also argue on appeal that § 363(m) applies to this matter and has rendered these appeals moot. Section 363(m) limits the remedies available on appeal when the purchaser has acted in good faith. Section 363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

The Bankruptcy Code does not define the term "good faith" for purposes of § 363(m), but the Ninth Circuit Court of Appeals repeatedly has stated that, in this context, a lack of good faith "typically [is] shown by fraud, collusion between the purchaser

15

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." In re Berkeley Delaware Court, LLC, 2016 WL 4437616 at *4 (citing Paulman v. Gateway Venture Partners III, L.P. (In Re Filtercorp, Inc.), 163 F.3d 570, 577 (9th Cir. 1998)); see also Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.), 846 F.2d 1170, 1173 (9th Cir. 1988); Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985). The Ninth Circuit also has said that a good faith purchaser is "one who buys in good faith and for value." Ewell v. Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992) (citations and internal quotation marks omitted).

Based on these and other Ninth Circuit authorities, we have held that the following factors are relevant to the good faith determination: (1) compliance with approved sale procedures; (2) arms-length negotiations, leading to a sale reflecting a purchase price at or near the market value of the property; (3) opportunity for competitive bidding; (4) knowledge in advance of the sale of who the proposed purchaser is; and (5) the absence of any evidence of fraud, collusion or grossly unfair advantage over other bidders. Zuercher Trust of 1999 v. Schoenmann (In re Zuercher Trust of 1999), 2016 WL 721485, at *9 (Mem. Dec.) (9th Cir. BAP Feb. 22, 2016).

Here, the bankruptcy court considered all of these factors and concluded that the factors militated in favor of a finding that Bush was a good faith purchaser for purposes of § 363(m). The court found that the sale "was negotiated and proposed in good faith," "was subject to competitive bidding at the hearing"

16

and was "the result of an arm's length transaction between the parties after lengthy negotiations."  The court also found that the proposed sale was the only currently available means for the estate to realize any value from the estate's assets and that a failure to approve the sale would almost certainly lead to Bush obtaining relief from stay and foreclosing on the estate's most valuable assets.

The appellants on appeal have not directly challenged any of these findings.  Nor did they specifically and distinctly argue that the bankruptcy court's good faith finding was clearly erroneous.

Even so, appellants did argue some points that, if proven correct, arguably would undermine the bankruptcy court's good faith finding.  The appellants primarily contend that Bush's loan and lien rights were unenforceable under Washington law.  They essentially argue that Gorski must have been acting collusively with Bush because he refused to commence and pursue an action in Washington state court to invalidate Bush's loan and lien rights. The appellants further maintain that, had Gorski done so, the value of KMM II's assets would have been rendered largely unencumbered, and then those assets could have been sold for millions of dollars, without the chilling cloud of Bush's credit bid and Bush's $8.1 million allowed secured claim hanging over KMM II's assets.

The appellants additionally assert that Gorski initially realized and acknowledged (in May and June 2014) that the loan and lien rights were unenforceable but later made a 180-degree turn (in September 2014) in order "to make the easiest sale to a

17

party who made sure [Gorski] was being adequately compensated," and Gorski therefore permitted Bush to buy "a valuable asset for a song, without even a semblance of competitive bidding." Aplt. Opn. Br. (Jan. 12, 2016) at p. 23.

Unfortunately for the appellants, the bankruptcy court found and determined to the contrary. The bankruptcy court's findings reflect its belief that Gorski had diligently determined that allowance of Bush's secured claim for $8.1 million and the proposed compromise and sale with Bush were in the best interests of the bankruptcy estate and its creditors. In so finding, the bankruptcy court apparently credited Gorski's declaration testimony representing that he painstakingly analyzed each and every grounds for attacking Bush's loan and lien rights and ultimately determined that he could not prevail on any of them even if he were to pursue them. The appellants obviously have a different belief; however, the bankruptcy court's findings are not illogical, implausible or without evidentiary support, so we must uphold them. See Wells Fargo Bank, N.A. v. Loop 76 LLC (In re Loop 76, LLC), 465 B.R. 525, 544 (9th Cir. BAP 2012) (citing In re Retz, 606 F.3d at 1196).

It is worth noting that the appellants never fully articulated their argument on how Gorski could have defeated Bush's loan and lien rights in Washington state court. All they ever presented to Gorski and the bankruptcy court were two or three Washington decisions holding that a six-year statute of limitations applies to actions on promissory notes and that the statute of limitations defense can be asserted in Washington to prevent a secured creditor from conducting a nonjudicial

18

foreclosure under a deed of trust encumbering Washington real property. See, e.g., Westar Funding Inc. v. Sorrels, 239 P.3d 1109, 1113 (Wash. Ct. App. 2010); Walcker v. Benson and McLaughlin, P.S., 904 P.2d 1176, 1177-78 (Wash. Ct. App. 1995). They never offered any analysis or case citations establishing that Washington law can and should be applied to determine the enforceability of a deed of trust encumbering California real property. In fact, the appellants never attempted to present, either in the bankruptcy court or on appeal, any sort of choice of law analysis. In contrast, the choice of law analysis that Bush presented to the court indicated that California law would apply to a mortgage or deed of trust encumbering California real property, even if a lawsuit was commenced elsewhere.

More importantly, the bankruptcy court did not adjudicate the issue of the validity of Bush's loan and lien rights, nor would it have been appropriate for it to do so in the context of the sale and compromise motion. The appellants never placed the validity of Bush's loan and lien rights squarely at issue before the bankruptcy court. The appellants never objected to Bush's proof of claim and never commenced an adversary proceeding seeking to determine the extent and validity of Bush's lien.

On appeal, the appellants essentially concede that, if they had done so, they would have lost because of the forum-related choice of law rules applicable to California bankruptcy courts. Aplt. Opn. Br. at p. 17; see also Sterba v, PNC Bank (In re Sterba), 516 B.R. 579, 584-85 (9th Cir. BAP 2014). Appellants, nonetheless, claim on appeal that Gorski should have authorized them to pursue the issue in Washington state court if

19

Gorski was unwilling to pursue it there himself. Aplt. Opn. Br. at p. 17. But there is nothing in the record indicating that appellants asked for such authority, either from Gorski or the bankruptcy court. The law is clear that the appellants could have done so. See Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.), 199 F.3d 1029, 1031 (9th Cir. 1999); Hansen v. Finn (In re Curry and Sorensen, Inc.), 57 B.R. 824, 827 (9th Cir. BAP 1986).

In sum, § 363(m) applies to the appellants' appeals from the bidding procedures order and the sale order. Consequently, appellants could not unwind the sale to Bush even if they were to prevail on appeal. Without this remedy, there is no meaningful relief we could grant to appellants in their appeals from the bidding procedures order and the sale order, so these two appeals are moot. See Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 880 (9th Cir. 2012) (stating that an appeal is moot if it is impossible for the court to grant any effective relief to the appellant).

Alternately, the appellants contend that their appeals from the sale order and the bidding procedures order are not moot because both California and Washington grant to the debtor a right of redemption – and other rights – upon the occurrence of a foreclosure sale. We acknowledge that there are a number of Ninth Circuit cases recognizing a redemption right exception to the mootness rules covering bankruptcy-court-issued sale orders; however, all of these cases involved appeals from bankruptcy court orders pertaining to foreclosure sales. See, e.g., Mann v. ADI Invs., Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir. 1990);

20

*Phoenix Bond & Indem. Co. v. Shamblin (In re Shamblin)*, 890 F.2d 123, 125 n.1 (9th Cir. 1989); *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1171-73 (9th Cir. 1988); *Sun Valley Ranches, Inc. v. Equitable Life Assurance Soc'y of the United States (In re Sun Valley Ranches, Inc.)*, 823 F.2d 1373, 1375 (9th Cir. 1987). Here, in contrast, the sale at issue was a trustee-initiated bankruptcy sale, rather than a creditor-initiated foreclosure sale. We know of no Ninth Circuit, California or Washington authority indicating that a debtor has a right of redemption following a trustee-initiated bankruptcy sale, nor have appellants pointed us to any such authority.

**3.   Appellate Review of Compromise Order**

This only leaves for our consideration the appellants' appeal from the compromise order. Arguably, the compromise order appeal also has been rendered moot under § 363(m). The Ninth Circuit has applied § 363(m) to the approval of a settlement when the settlement involved a sale of the bankruptcy estate's legal claims and the bankruptcy court invoked and followed the legal standards applicable to § 363 sales. See In re Berkeley Delaware Court, LLC, 2016 WL 4437616 at *3.

That being said, it is questionable whether we should extend the holding of In re Berkeley Delaware Court, LLC to the present compromise order appeal. Unlike in Berkeley Delaware Court, the estate property sold here really did not include the estate's legal claims, per se. Furthermore, the bankruptcy court here seemed to separately consider and rule upon the sale aspects and the compromise aspects of the transaction entered into between

21

Gorski and Bush. As best we can tell from the limited record provided, the bankruptcy court's approval of the compromise aspects presumably focused on the legal standards governing compromise of controversies under Rule 9019(a) and not on the legal standards governing § 363 sales.

Therefore, under the unique procedural history of this case, we conclude that § 363(m) should not be applied to the bankruptcy court's compromise order, and the appeal therefrom is not moot. Even so, the appellants still cannot prevail. The appellants did not order the transcript from the final compromise hearing held on July 20, 2015, at which the bankruptcy court orally stated its findings of fact and conclusions of law on the record. This makes it impossible for us to conduct any meaningful, informed review of the bankruptcy court's compromise order. See Kyle v. Dye (In re Kyle), 317 B.R. 390, 393-94 (9th Cir. BAP 2004), aff'd, 170 Fed. Appx. 457 (9th Cir. 2006) (stating that the Panel may exercise its discretion to dismiss or summarily affirm when the appellant's failure to provide an adequate record prevents informed appellate review).

In addition, appellants' appeal brief did not contain any arguments specifically and distinctly challenging the bankruptcy court's compromise order. As a result, appellants have forfeited any such arguments they could have made. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 487-88 (9th Cir. 2010); Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010).

In short, appellants have not presented us with any grounds that would justify reversal of the bankruptcy court's compromise order, nor are any such grounds evident from the record available

22

to us.  Accordingly, the compromise order must be affirmed

**CONCLUSION**

For the reasons set forth above, we DISMISS AS MOOT the appeals from the bankruptcy court's bidding procedures order and its sale order.  The compromise order is AFFIRMED.

23